The **ROCKET FREIGHT LINES CO.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD,** Respondent.

and

**Tulsa General Drivers, Warehousemen &
Helpers Local Union 523,** Intervenor.

No. 342–69.

United States Court of Appeals,
Tenth Circuit.

June 12, 1970.

Carl D. Hall, Jr., of Hall & Sublett, Tulsa, Okl., for petitioner.

Nancy Sherman, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Lawrence I. Kipperman, Wash-

ington, D. C., on the brief) for respondent National Labor Relations Board.

L. N. D. Wells, Jr., of Mullinax, Wells, Mauzy & Collins, Dallas, Tex., for intervenor Teamsters Local Union 523.

Before LEWIS, Chief Judge, and BREITENSTEIN and SETH, Circuit Judges.

LEWIS, Chief Judge.

The Rocket Freight Lines Co. (Rocket) seeks review of an order of the National Labor Relations Board dismissing a complaint issued by the Regional Director of the Sixteenth Region alleging the commission of an unfair labor practice in violation of section 8(b) (1) (A) of the National Labor Relations Act, 29 U.S.C. § 158(b) (1) (A), by Local 523 of the Teamsters (Local 523). On Rocket's charge, the Regional Director complained that Local 523 had levied a fine of $250 [1] against each of 17 member-employees for crossing picket lines and returning to work after the Local had consummated a collective-bargaining agreement which was binding between Rocket and the Local. The imposition of fines for breaking an unprotected strike was alleged to contravene the employees' rights to form and join unions, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining, all in derogation of their section 7 rights, as referred to in section 8.[2] Local 523, as intervenor, responded that the fines had been levied as a lawful imposition of internal union discipline upon members who had broken their own strike. The Board found the contention of the Local to be sound in fact and law.

The following neutral facts, resting largely on stipulations, may be summarized. Rocket operates a trucking concern in Oklahoma where 70 of its employees, constituting a single bargaining unit, are represented at six terminals by three locals of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (International). Local 523 covers Rocket employees at the Tulsa, Ponca City, and Prior terminals. From 1964–1967 Rocket had been party to a "master" collective bargaining agreement, with wage rates applicable to the Southwest, which was supplemented by riders applicable only to Oklahoma terminals. Two letters sent to Rocket in December 1966, from the International's Over-the-Road and City Cartage Policy and Negotiating Committee (Negotiating Committee) and signed by the International's General President initiated negotiations for a collective-bargaining agreement to replace the current one terminating on March 4, 1967. By letter to the General President on January 9, 1967, Rocket requested that the negotiations be conducted in Oklahoma rather than Washington, D. C. The Negotiating Committee, in turn, notified Rocket that International Representative Clarence R. Mandoiza had been appointed to head a subcommittee in charge of the Oklahoma negotiations. At a May 15, 1967 meeting attended by other motor carriers, Rocket withdrew and advised Mandoiza that it wished to bargain separately.

Thereafter, negotiating sessions with Rocket were held on May 17, 24, June 6, and 22. Again, the three locals were present; Mandoiza attended all but the May 17 meeting. On June 6, Mandoiza notified Rocket that a strike would commence on the 7th, and Rocket's employees accordingly went on strike at its six terminals. At the June 22 session, agree-

---

1. The procedures by which the fines were imposed have not been challenged; rather, the justification for the fines is attacked.

2. Section 8 of the National Labor Relations Act provides in pertinent part:
    (b) It shall be an unfair labor practice for a labor organization or its agents—

(1) to restrain or coerce (A) *employees in the exercise of the rights guaranteed in section 7: Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its rules with respect to the acquisition or retention of membership therein. * * * (emphasis added).

ment was reached by the bargaining representatives; and on Mandoiza's recommendation, the proposed contracts were ratified by a majority of Rocket's employees on June 22–23. Mandoiza on June 23 stated that he would recommend the contract to the International for its approval, and there is apparent agreement that the approval was expected no later than June 26. Although picketing was discontinued over the weekend pending approval, no employee returned to work. On June 29 Mandoiza, on behalf of the International or Southern Conference, informed Local 523 that the contract had been disapproved and picketing was resumed at some terminals, including Tulsa.

The action of the International undoubtedly came as a surprise and a disappointment to all, including Rocket's employees. Reflecting this disappointment, the Tulsa picket captain presented the International with two petitions to approve the contract but received no satisfaction. On July 17 the 17 subject employees crossed the Tulsa picket line and returned to work. The then ineffective picket line, as well as those at the other terminals, was removed on July 19, and on July 26 a contract was signed in accord with the original negotiated terms and made effective as of June 26, 1967.

■ In brief and argument both Rocket and Local 523 present this case to us as one having far-reaching effects on the basic concept of the National Labor Relations Act in the multi-party re-

lationships of national and local unions, union members, management, and employees. For example, Rocket, pointing to the fact that a majority of the union members of the three locals whose contracts were being negotiated voted to approve the contracts submitted, asserts that if such a vote to become effective must run the gauntlet of International's approval then, so concludes Rocket, "the scheme of industrial democracy envisioned by the National Labor Relations Act will be dealt a blow of such staggering proportion as to render it sterile and meaningless." And Local 523, pointing in turn to the fact that Rocket was negotiating with unions and not union members, asserts that "a bargaining agent is not required as a matter of law to accede to the wishes of an infinitesimal minority of those covered by an area or national contract." The Local then contends that International disapproved the contract because of a disparity between national and local wage scales and then concludes that the "very process of *collective* bargaining is at issue in this case * * *.[3] We conclude that these arguments must dissolve in the aura of hyperbole when viewed in the light of the issue presented to the Trial Examiner as reflected in the record. The Trial Examiner refined the issue to a determination of whether a binding contract was in effect at the time the subject employees crossed their own picket line. We agree that if such a contract was *not* in effect that the coercive action of Local 523 must be upheld. The Examiner found there

3. Rocket has also alleged only before this court that the International wrongfully refused timely to execute the contract and has failed to explain the month's delay in doing so. Although both the respondent Board and Local 523 have addressed this argument, we are precluded from reviewing the question by 29 U.S.C. § 160(f), which directs us to examine a Board order on petition of an aggrieved party "in the same manner as in the case of an application by the Board under subsection (e) * * *." The latter provides: "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect

to urge such objection shall be excused because of extraordinary circumstances." Rocket has not sought to broaden our inquiry by applying under subsection (e), which states that

[i]f either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before [the Board's agent] * * * the court may order such additional evidence to be taken before [him] * * * and to be made a part of the record.

was no valid contract and the Board reviewed and adopted the findings, conclusions and recommendations without modification or comment. *See* 29 U.S.C. § 160(c). Our review is thus confined to applying the substantial evidence test to the Examiner's findings in light of the record as a whole. 29 U.S.C. § 160 (f); *e. g.,* Love Box Co. v. NLRB, 10 Cir., 412 F.2d 946, 947, modified on rehearing on other grounds, 422 F.2d 232. We conclude that the Board's order to dismiss must be upheld.

The evidence probing the subjective intent and knowledge of the negotiating parties as to when a binding contract was or could be consummated does not present the usual conflict involving a determination of credibility but resolves to a determination of inferences that can be properly drawn from that evidence. The Board, supporting the Trial Examiner, found that at all relevant times Rocket was bargaining with the International and that the parties had a "clear understanding" that a binding contract was conditional on the International's approval. The record amply supports this finding. The negotiations had twice splintered off from national and statewide negotiations with International; an International representative had conducted the negotiations and had called the original strike and imposed the picketing; at the closing of local negotiations Mandoiza stated that he would "highly recommend" the negotiations to the International. Although it is quite clear that after approval of the contract

by the Local membership that all local parties expected International approval to be immediately forthcoming, still the strike did not end pending that approval. No one returned to work although the picketing was lifted. After International rejected the contract picketing was resumed and no one, other than the 17 employees, returned to work until July 19. Moreover, the petitions to the International can only be construed as persuasion to approve the contract, not as a majority vote to abandon the strike, and as further affirmation that the signatories acknowledged the requirement of International approval.[4]

It follows that the Board could properly conclude that the subject members of Local 523 went to work during an authorized strike and could be disciplined for so doing under the mandate of NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123. The union action was not at odds with the National Labor Relations Act nor with any public policy which the Act is designed to implement. *See* Scofield v. NLRB, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385; NLRB v. Industrial Union of Marine & Shipbuilding Workers, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706. Rather, the union action falls directly within the policy of the Act as stated in *Allis-Chalmers:*

Integral to this federal labor policy has been the power in the chosen union to protect against erosion its status under that policy through reasonable discipline of members who violate

4. The two petitions referred to above were addressed to the office of the International's General President. Forty signatures were registered. Each petition requested that the International sign the latest contract negotiated with Rocket and ratified by a majority of the membership of the three locals, which was, of course, the contract ratified on June 23, 1967, and submitted for International approval. Apparently, these petitions were circulated and received after June 29, 1967, the date the International disapproved the contract. A third petition, signed by 36 of the member-employees, was directed to the Sixteenth Region of

the NLRB and asked the Board "to rule in favor of the Rocket Freight Lines Company in their case against the International Headquarters of Teamsters." We must assume that this petition followed the previous two and was dated after June 29. Rocket had filed charges with the Board on July 3, 1967, against the International and three locals alleging violations of section 8(b) (3) of the Act on the ground that the unions had refused to approve the agreed on contract. The charge was later withdrawn. The Trial Examiner treated the first two petitions as a single one, but did consider all three in making his findings.

rules and regulations governing membership. That power is particularly vital when the members engage in strikes. The economic strike against the employer is the ultimate weapon in labor's arsenal for achieving agreement upon its terms, and "[t]he power to fine or expel strike breakers is essential if the union is to be an effective bargaining agent * * *." 388 U.S. at 181, 87 S.Ct. at 2007 (footnotes omitted).

The petition for review is denied.