459 F.2d 1143
 148 U.S.App.D.C. 119, 67 Lab.Cas. P 12,404
 BOOSTER LODGE NO. 405, INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
The Boeing Company, Intervenor. The BOEING COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Booster Lodge No. 405, International Association of
Machinists and Aerospace Workers, AFL-CIO, Intervenor.
 Nos. 24687, 24744.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 15, 1971.
Decided Feb. 3, 1972.
 
 Mr. Bernard Dunau, Washington, D. C., with whom Messrs. Plato E. Papps, Washington, D. C., and C. Paul Barker, New Orleans, La., were on the brief, for petitioner in No. 24,687 and intervenor in No. 24,744.
 Mr. C. Dale Stout, New Orleans, La., for petitioner in No. 24,744 and intervenor in No. 24,687.
 Mr. Glen M. Bendixsen, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Washington, D. C., at the time the brief was filed, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Stanley R. Zirkin, Atty., National Labor Relations Board, were on the brief, for respondent.
 Before MacKINNON and WILKEY, Circuit Judges, and GOURLEY,* Senior District Judge for the Western District of Pennsylvania.
 MacKINNON, Circuit Judge:
 
 
 1
 In this case, we are called upon to examine the right of a labor organization, consonant with the provisions of the National Labor Relations Act (N.L.R.A.), to discipline those members who have crossed its picket line to work during an authorized strike. We must determine the effect which a member's resignation from the union, before, during, or after such conduct, has upon the union's disciplinary authority. We are also requested to consider the legal implications of the "reasonableness" of the fines imposed, where the union has threatened enforcement thereof, or has actually sought collection through legal means.
 
 
 2
 The essential facts are not in dispute. Booster Lodge No. 405, International Association of Machinists and Aerospace Workers, AFL-CIO (hereinafter sometimes referred to as the Union), and The Boeing Company, (hereinafter sometimes referred to as the Company), were parties to a collective bargaining agreement which was effective from May 16, 1963, through September 15, 1965.[1] Upon the expiration of the contract, the Union commenced a lawful strike against Boeing at its Michoud plant, as well as at various other locations. This work stoppage lasted 18 days. On October 2, 1965, a new bargaining agreement was signed, and the economic strikers returned to work the following day. Both the expired agreement and the newly executed contract contained maintenance-of-membership clauses, which required all new employees to notify both the Union and the Company within 40 days of their acceptance of employment if they elected not to become Union members. It also required those who were Union members to retain their membership during the contract term.
 
 
 3
 During the strike period, approximately 143 employees, of the 1900 production and maintenance employees represented by the Union at the Michoud plant, crossed the picket line and reported to work. All of these persons had been Union members during the 1963-1965 contract period. Some of the employees who worked during the strike made no attempt to resign from the Union during the strike. The remaining 119 submitted their voluntary resignations, in writing, to both the Union[2] and the Company. About 61 of the employees who resigned did so before they crossed the picket line and returned to work. Another 58 resigned during the course of the strike, but after they had crossed the picket line in order to work. All resignations were submitted after the expiration of the 1963-1965 contract, and before the execution of the new agreement, and all were submitted prior to the imposition of any Union discipline. Union members had not been warned prior to the strike that disciplinary measures could, or would, be taken against those who crossed the picket line to work, nor had any such discipline been imposed on members by Booster Lodge 405 prior to this time.
 
 
 4
 In late October or early November of 1965, the Union notified all members and former members who had crossed the picket line to work during the strike that charges had been preferred against them under the International Union Constitution, for "Improper Conduct of a Member" due to their having "accept[ed] employment . . . in an establishment where a strike exist[ed]." They were advised of the dates of their Union trials, which were to be held even in their absence if they did not appear, and they were notified of their right to be represented by any counsel who was a member of the International Association of Machinists and Aerospace Workers. Pursuant to the International Union Constitution provision which permitted the imposition of disciplinary measures, including "reprimand, fine, suspension, or expulsion from membership, or any lesser penalty or combination," where a member had been found guilty of misconduct after notice and a hearing, fines were imposed on all employees who had worked during the strike. No distinction was drawn between those persons who had resigned from the Union during the course of the strike and those who had remained Union members.
 
 
 5
 Employees who did not appear for trial before the Union Trial Committee and those who appeared but were found guilty were fined $450.00 each, the amount determined by the membership, and they were barred from holding a Union office for a period of 5 years. The fines of about 35 employees who appeared for trial, apologized, and pledged loyalty to the Union, were reduced to 50 percent of the earnings they received during the strike.[3] In some of these cases the time period during which these persons were prohibited from holding Union office was decreased to a period based upon the number of days of strikebreaking activity each respective person had engaged in. None of the disciplined individuals processed intra-Union appeals.
 
 
 6
 Although none of the $450.00 fines has been paid, reduced fines have been paid in some instances. The Union has sent out written notices that the matter has been referred to an attorney for collection, that suit will be filed if the fines remain unpaid, and that reduced fines will be reinstated to $450.00 in the event of nonpayment. The Union has also filed suit against nine individual employees to collect the fines (plus attorney's fees and interest). None of these suits has yet been resolved.
 
 
 7
 On February 18, 1966, the Company filed a charge with the N.L.R.B., alleging that the Union had violated Section 8(b) (1) (A) of the N.L.R.A.,[4] and a complaint was issued by the General Counsel. The Labor Board decided that the Union violated section 8(b) (1) (A): (1) by fining those employees who had resigned from the Union before they returned to work during the strike; and (2) by disciplining those employees who had resigned after returning to work, to the extent that the fines were imposed for their working during the strike after their resignations. The Board further found that the Union did not violate the Act (3) by fining members for crossing the picket line to work, and by fining those employees who had resigned after returning to work during the strike, for work they performed during the strike prior to their resignations.
 
 
 8
 Finally, the Board determined (4) that it was not the intention of Congress to have the N.L.R.B. regulate the size of such disciplinary fines and establish standards with respect to their reasonableness, and it dismissed the claim that otherwise legal fines may be rendered violative of the N.L.R.A. if unreasonably large. A cease and desist order was issued, and the Union was ordered to refund any fines collected from employees who had resigned before returning to work. The Union was also required to refund a pro rata portion of those fines collected from employees who had resigned after first engaging in work during the strike, so that the part of the fines retained would only reflect preresignation conduct.
 
 
 9
 Booster Lodge 405 challenges the Board's conclusion that a mid-strike resignation from a union relieves an individual from the burden of union discipline with respect to his post-resignation activity, while The Boeing Company contends that the N.L.R.B. should have examined the reasonableness of the fines imposed by the Union. The Board seeks enforcement of its order.
 
 
 10
 Part I of this opinion discusses the legality of the imposition of the disciplinary fines by the Union in response to the strikebreaking by the approximately 143 employees involved. Part II considers the effect the reasonableness of the fines has upon their propriety under the N.L.R.A., and the proper function of the N.L.R.B. in this area. Finally, Part III deals with the propriety of the Board's remedial order.
 
 
 11
 * The Legality of the Disciplinary Fines
 
 A. The Employees Who Did Not Resign
 
 12
 As early as 1954, in Minneapolis Star and Tribune Co., 109 NLRB 727 (1954), the Labor Board held that a union did not violate Section 8(b) (1) (A) of the Act by imposing a fine on a member for his failure to perform picket duty during the course of an authorized strike. The Board declared that the proviso to 8(b) (1) (A)[5] precluded any interference by it with the internal affairs of a labor organization in such a situation. In N.L.R.B. v. Allis-Chalmers Manufacturing Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967), a divided Supreme Court similarly determined that a union did not violate the N.L.R.A. when it imposed, and attempted to enforce through court action, reasonable fines against members for their failure to honor an authorized picket line. Instead of relying upon the express language of the proviso, however, the Supreme Court carefully analyzed the entire legislative history of Section 8(b) (1) (A), and it concluded that Congress did not intend to prohibit such internal union discipline by the prohibition against "restraint" or "coercion." See 388 U.S. at 183-195, 87 S.Ct. 2001.[6] The Court noted:
 
 
 13
 National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions. The policy therefore extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees. "Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents . . ."
 
 
 14
 388 U.S. at 180, 87 S.Ct. at 2006. See J. I. Case Co. v. N.L.R.B., 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944). The Court further stated:
 
 
 15
 Integral to this federal labor policy has been the power in the chosen union to protect against erosion [of] its status under that policy through reasonable discipline of members who violate rules and regulations governing membership. That power is particularly vital when the members engage in strikes. The economic strike against the employer is the ultimate weapon in labor's arsenal for achieving agreement upon its terms, and "[t]he power to fine or expel strikebreakers is essential if the union is to be an effective bargaining agent . . ."
 
 
 16
 388 U.S. at 181, 87 S.Ct. at 2007.
 
 
 17
 In more recent decisions, the Supreme Court has reaffirmed the right of a union to impose and enforce reasonable fines against members who engage in strikebreaking activities. In Scofield v. N.L.R.B., 394 U.S. 423, 428-430, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969), the Court emphasized the right of a union to enforce a properly adopted rule which reflects a legitimate union interest, impairs no statutory labor policy, and is reasonably enforced against union members. See N.L.R.B. v. Industrial Union of Marine etc. Workers, 391 U.S. 418, 423, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968). See also Rocket Freight Lines Co. v. N.L.R.B., 427 F.2d 202, 205-206 (10th Cir.), cert. denied, 400 U.S. 942, 91 S.Ct. 241, 27 L.Ed.2d 246 (1970); Silard, Labor Board Regulation of Union Discipline After Allis-Chalmers, Marine Workers and Scofield, 38 Geo.Wash.L. Rev. 187 (1969). In light of these developments,[7] it is clear that the Union acted within the sphere of its lawful authority when it decided to impose fines on the 24 strikebreaking members who did not resign from the Union.[8] Similarly, the Union's threats to enforce these fines, as well as its actual efforts to achieve court enforcement thereof, were not prohibited by the N.L.R.A. However, a more difficult question arises with respect to the 119 employees who resigned from the Union during the strike period.
 
 B. The Employees Who Did Resign
 
 18
 As the Supreme Court recognized in Allis-Chalmers, when Section 8(b) (1) (A) was enacted, "Congress was operating within the context of the 'contract theory' of the union-member relationship which widely prevailed at that time." N.L.R.B. v. Allis-Chalmers Mfg. Co., supra, 388 U.S. at 192, 87 S. Ct. at 2013. See International Association of Machinists v. Gonzales, 356 U.S. 617, 618, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958). Under this theory union membership was deemed in effect to create a "contract" between the labor organization and the member which imposed certain obligations on the member, and the decision emphasized "that 'The courts' role is but to enforce the contract."' 388 U.S. at 182, 87 S.Ct. at 2008. See Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L.J. 175, 180 (1960). It is, therefore, obvious that membership in the labor organization is the sine qua non to the authority of a union to impose disciplinary burdens upon the employees it represents. This has been widely recognized.
 
 
 19
 In Allis-Chalmers, the Court expressly limited its holding to "reasonable discipline of members who violate rules and regulations governing membership." N.L.R.B. v. Allis-Chalmers Mfg. Co., supra, 388 U.S. at 181, 87 S.Ct. at 2007 (emphasis supplied). See also id. at 195-196.[9] The Labor Board specifically recognized this indispensable prerequisite in Scofield, 145 NLRB 1097, 1104 (1964), where it noted that "[a] union rule that a member is subject to a fine if he [violates a valid union rule] does not mean that he is subject to such a fine as an employee." (Emphasis in original.) This membership requirement for union disciplinary authority was affirmed by the Supreme Court in Scofield v. N.L.R.B., 394 U.S. 423, 429, n. 5, 89 S.Ct. 1154, 1157, 22 L.Ed.2d 385:
 
 
 20
 As an employee, [an individual] may be a "good, bad, or indifferent" member so long as he meets the financial obligations of the union security contract. * * * But as a union member, so long as he chooses to remain one, he is subject to union discipline. (Emphasis supplied.)
 
 
 21
 See 394 U.S. at 435, 89 S.Ct. at 1160. Thus the Court recognized that "union members . . . are free to leave the union and escape the [union] rule." Id. at 430, 89 S.Ct. at 1158.[10] It is therefore apparent that Booster Lodge 405 only had the authority to discipline those employees who were in fact Union members at the time they engaged in the complained of activity.
 
 
 22
 Approximately 58 of the employees who worked during the strike submitted their resignations to the Union after they had already engaged in some of the conduct proscribed by the International Union Constitution. In light of the above discussion regarding union authority over action undertaken by full members, we must concur in the Board's determination that the Union did not violate Section 8(b) (1) (A) so far as its imposition of disciplinary fines concerned this preresignation conduct. The fact that the fines were not officially imposed for these pre-resignation breaches of Union regulations until after the strikebreakers had resigned, in no way negated the authority of the Union over these persons with respect to these acts, as the N.L.R.B. properly recognized.
 
 
 23
 The provisions of a contract are enforceable, and a cause of action can be brought upon them, even after the expiration or termination of the agreement. The rights and duties created by an agreement are extinguished only prospectively by the termination thereof. Thus the termination of some employees' membership here did not affect the Union's subsequent assertion of rights which had accrued to the Union during their earlier period of membership, such as the right to discipline the employees for prior strikebreaking. The effect of these employees' resignations was only to extinguish the Union's future authority over them.
 
 
 24
 Booster Lodge No. 405, International Association of Machinists and Aerospace Workers, AFL-CIO, 185 NLRB No. 23, 1970 CCH NLRB p 22,259, at p. 28,693 (1970).[11]
 
 
 25
 C. Fines Imposed for Post-resignation Conduct
 
 
 26
 An extremely difficult question is presented with respect to the fines which were imposed upon employees for their post-resignation conduct.[12] Booster Lodge 405 has made a sophisticated argument which would expose persons who were members at the commencement of a particular strike to union discipline with respect to any strikebreaking action undertaken during that specific work stoppage. Although it concedes that such a restriction is not contained in any of the express language of the International Union Constitution or Bylaws, the Union urges this court to "flesh out" such documents by imposing such an obligation by implication. We must decline this invitation.
 
 
 27
 It must be emphasized that in situations like this, while "the function of the court is to determine, as far as is possible, the intention of the contracting parties and to give legal effect thereto,"[13] it is generally recognized that courts will not usually imply offenses not specified in a union's constitution or by-laws.[14] We believe that this latter consideration is controlling with respect to the instant case. As the union recognizes, there is nothing in the record which evidences any intention on the part of the approximately 119 persons who resigned during the strike in question that their initial acceptance of Union membership would impose upon them the type of continuing obligation which Booster Lodge 405 now asks this court to impose. Furthermore, the very fact that they resigned during this period, in an obvious attempt to escape the disciplinary authority of the Union, belies this proposed line of reasoning.
 
 
 28
 In addition, an extremely important national labor policy militates against the imposition of such an implied obligation. Section 7 of the N.L.R. A.[15] expressly protects the right of any employee to refrain from any or all of the concerted activities guaranteed to employees under the Act. While Allis-Chalmers and Scofield recognized the legality of certain express union provisions limiting an employee's freedom where he had voluntarily accepted full union membership, nothing in those decisions supports the Union's theory of implied, post-resignation restrictions. In fact, language in Scofield expressly indicates otherwise. The Supreme Court only recognized the right of a union "to enforce a properly adopted rule which reflects a legitimate union interest, impairs no policy Congress has imbedded in the labor laws, and is reasonably enforced against union members who are free to leave the union and escape the rule." Scofield v. N.L.R.B., supra, 394 U.S. at 430, 89 S.Ct. at 1158 (emphasis supplied). As the Board properly concluded below, after resignation, "[b]oth the member's duty of fidelity and the union's corresponding right to discipline him for breach of that duty are extinguished." Booster Lodge No. 405, International Association of Machinists and Aerospace Workers, AFL-CIO, supra, 1970 CCH NLRB p 22,259, at p. 28,692.
 
 
 29
 The Union has relied heavily upon the First Circuit's holding in N.L.R.B. v. Granite State Joint Board, Textile Workers Union, Local 1029, 446 F.2d 369 (1st Cir. 1971), but we believe that the decision is inapposite to the present fact situation. Although the court in Granite State upheld the right of the union involved to impose fines on strike-breakers for post-resignation activity, it emphasized that a specific set of facts was present which it believed rendered such a result equitable, and it specifically recognized that these considerations were not present with respect to the instant Booster Lodge 405 case.[16] In Granite State, the Board conceded that all of the fined employees had voted in favor of the strike in question.[17] It is also important to note that the fines had not been imposed pursuant to a general provision in the union constitution, as here, but rather in accordance with a specific proclamation which had been unanimously adopted by the membership after the work stoppage commenced. See 446 F.2d at 370, 372 n. 5. Furthermore, all of those who were disciplined in Granite State had been expressly pre-warned of possible punishment for strikebreaking,[18] while the employees with whom we are herein concerned received no such prestrikebreaking notification. Because of these distinguishing facts, we refuse to apply the rationale of Granite State to the instant factual situation.[19] The strong equities which weighed in favor of the union there, are clearly not present here. In fact, their very absence powerfully supports the result which we have accepted.
 
 
 30
 Since the International Union Constitution and By-laws contained no express restriction upon a member's right to resign it is clear that the strikebreaker/employees were free to resign at will, subject only to their being bound by any permissible collective bargaining agreement provision limiting this right. Local Union 621, United Rubber, Cork, Linoleum and Plastic Workers of America, 167 NLRB 610 (1967); Communications Workers v. N. L.R.B., 215 F.2d 835 (2d Cir.1954); N. L.R.B. v. Mechanical and Allied Production Workers, Local 444, 427 F.2d 883 (1st Cir.1970). Furthermore, since the resignations all occurred after the termination of the 1963-1965 agreement and before the execution of the new contract, the maintenance-of-membership provision was not applicable to limit this right either. N.L.R.B. v. Mechanical and Allied Production Workers, Local 444, supra, 427 F.2d at 884-885; N.L.R. B. v. Granite State Joint Board, Textile Workers Union, Local 1029, supra, 446 F.2d at 372. Under these circumstances we concur in the reasoning of the Second Circuit in Communications Workers v. N.L.R.B., supra, 215 F.2d at 838:
 
 
 31
 We agree that the proviso [to Sec. 8(b) (1) (A)] protects the Union's right to make its own rules with respect to membership, but assuming, arguendo, that a rule wholly prohibiting voluntary resignations would be valid, we think that in the absence of any rule on the subject of voluntary resignation, the proviso is inapplicable. Concededly the Union Constitution and by-laws are absolutely silent as to whether a member can voluntarily resign. Hence we think that the common law doctrine on withdrawal from voluntary associations is apposite. Under that doctrine, a member of a voluntary association is free to resign at will, subject of course to any financial obligations due and owing the association. [citations omitted[20]
 
 
 32
 For the reasons set out above, we conclude that the Labor Board correctly determined that "the Union's right to discipline employees terminated upon the employees' submission of their letters of resignation [, thus t]he attempted imposition of discipline for subsequent conduct was beyond the powers of the Union." Booster Lodge No. 405, International Association of Machinists and Aerospace Workers, AFL-CIO, supra, 1970 CCH NLRB p 22,259, at p. 28,692.[21] We therefore affirm the Board's finding that the Union violated Section 8(b) (1) (A) of the N.L.R.A. by imposing fines upon employees, and by threatening or attempting enforcement of such fines, because of those employees' post-resignation conduct in working at the Company plant during the authorized work stoppage.[22] Since the imposition of fines under such circumstances violated the policies underlying the N.L.R.A. and had effects outside the area of internal Union affairs, they were clearly "coercive" within the meaning of Section 8(b) (1) (A). See N.L. R.B. v. Industrial Union of Marine etc. Workers, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968); District 50, Local 12419, 176 NLRB No. 89, 71 LRRM 1311 (1969); Local 138, International Union of Operating Engineers, AFL-CIO, 148 NLRB 679 (1964). See also International Molders and Allied Workers, Local 125, 178 NLRB 208, 72 LRRM 1049 (1969), enfd., 442 F.2d 92 (7th Cir.1971).[23] We thus grant enforcement of the N.L.R.B.'s cease and desist order so far as it concerns the imposition of fines for post-resignation conduct.[24]
 
 II
 
 33
 The Board's Duty to Determine the Reasonableness of Fines
 
 
 34
 In its decision below, the N.L.R.B. relied upon a companion case, International Association of Machinists and Aerospace Workers, Local 504 [Arrow Development Co.], 185 NLRB No. 22, 75 LRRM 1008 (1970),[25] in concluding that a fine's "reasonableness" has no effect upon its legality under the N.L. R.A. This conclusion was based upon the Board's belief that Congress did not intend to empower the Labor Board with the authority to examine the severity of union discipline when ascertaining its legality, and it indicated that it thought that local courts were the most logical tribunals for the establishment of standards of reasonableness. The Board therefore refused to examine the question of reasonableness in the present case, despite an express determination by the Trial Examiner that the imposed fines were impermissibly excessive. We reject the position of the Board,[26] and remand the case for further proceedings in conformity with the views set out below.[27]
 
 
 35
 The Board's belief that it does not have the obligation of examining the reasonableness of union fines in Section 8(b) (1) (A) proceedings is based upon a clear misconception of the law and the Supreme Court's relevant decisions. In Allis-Chalmers, the Court stated:
 
 
 36
 It is no answer that the proviso to Sec. 8(b) (1) (A) preserves to the union the power to expel the offending member. Where the union is strong and membership therefore valuable, to require expulsion of the member visits a far more severe penalty upon the member than a reasonable fine.
 
 
 37
 N.L.R.B. v. Allis-Chalmers Mfg. Co., supra, 388 U.S. at 183, 87 S.Ct. at 2008 (emphasis supplied). The Court further recognized that "the proviso preserves the rights of unions to impose fines, as a lesser penalty than expulsion . . ." 388 U.S. at 191-192, 87 S.Ct. at 2012 (emphasis supplied).[28] This implicitly recognized that, for a disciplinary fine to be less coercive than expulsion from the union, the fine imposed must be a "reasonable" one, for it is intuitively obvious that enforcement of a grossly excessive fine might visit a far greater burden upon an individual than would mere expulsion.[29] The Supreme Court also expressly recognized this fact in its recent Scofield decision, wherein it concluded that the enforcement of a proper union rule "by reasonable fines does not constitute the restraint or coercion proscribed by Sec. 8(b) (1) (A)." Scofield v. N.L.R.B., supra, 394 U.S. at 436, 89 S.Ct. at 1161 (emphasis supplied). The Scofield Court emphasized that under Allis-Chalmers, "[a] union rule, duly adopted and not the arbitrary fiat of a union officer, forbidding the crossing of a picket line during a strike [is] . . . enforceable against voluntary union members by expulsion or a reasonable fine." 394 U.S. at 428, 89 S. Ct. at 1157 (emphasis supplied). In light of the Court's emphasis on the requirement of "reasonable fines" if a union is to avoid a violation of the Act in these circumstances, we must conclude that the imposition of an unreasonably large fine, at least where the union threatens or actually attempts court enforcement of the fine, may be coercive and restraining within the meaning of section 8(b) (1) (A).
 
 
 38
 Since the imposition of an unreasonably excessive disciplinary fine is violative of Section 8(b) (1) (A), it is clearly the obligation of the N.L.R.B. to resolve the question of reasonableness where such an issue is appropriately raised. The Board asserts that such a result might cause conflicts between it and state courts which attempt to examine the reasonableness issue in actions to collect such fines. However, we do not believe that this possible problem detracts from the Board's obligation under the N.L.R.A.[30]
 
 
 39
 We recognize that "state courts have been adjudicating internal union disputes for more than 60 years." Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L. J. 175 (1960).[31] We further acknowledge the fact that "the state courts, in reviewing the imposition of union discipline, find ways to strike down 'discipline, [which] involves a severe [monetary] hardship."'[32] However, these considerations do not relieve the N.L.R. B. of its duties under the N.L.R.A. "[T]he business of the Board, among other things, is to adjudicate and remedy unfair labor practices. Its authority to do so is not 'affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise . . .' Sec. 10(a), . . . 29 U.S.C. Sec. 160(a)." N.L.R.B. v. Strong, 393 U.S. 357, 360, 89 S.Ct. 541, 544, 21 L.Ed.2d 546 (1969). See Office and Professional Employees International Union, Local 425 v. N.L.R.B., 136 U.S.App.D.C. 12, 15-16, 419 F.2d 314, 317-318 (1969).[33] Furthermore, the fact that some state courts might not permit enforcement of excessive fines in a collection action by the union, does not detract from their coerciveness, or the need for N.L.R.B. action. N.L.R. B. v. American Bakery and Confectionery Workers, Local 300, 411 F.2d 1122, 1126 (7th Cir.1969). See Local Union No. 167, Progressive Mine Workers of America v. N.L.R.B., 422 F.2d 538, 542 (7th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2198, 26 L.Ed.2d 560 (1970).
 
 
 40
 Other factors also support the conclusion that Board intervention is authorized in this very limited area, despite the historical activity of state courts and the reluctance of the 80th Congress to interfere in the internal affairs of unions. There is something to be said for having the reasonableness of fines determined by standards that are as nearly uniform as national standards promulgated by the N.L.R.B. can be. Furthermore, access to the Labor Board is more readily available than meaningful access to state courts. Before the Board, the employee is represented by the General Counsel, and the agency bears the expense of the litigation. If the same employee wants a complete resolution of the reasonableness issue in a state court collection action brought by the union, he must be prepared to accept at least some financial burden. "The danger that the legal rights of a disciplined member will go by default because of the cost of asserting them in court is obvious . . ." Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L.J. 175, 220 (1960). We therefore reject the argument that the N.L.R.B. is required to defer to state tribunals with respect to the reasonableness issue. Such "reverse preemption" would not, in our view, be consonant with the principles underlying the N.L.R.A.[34]
 
 
 41
 Although the Board has not previously had to examine the reasonableness of union fines, it is not without experience in a related area. Under Section 8(b) (5),[35] it is required to determine whether initiation fees required by a labor organization under a unionsecurity agreement are excessive.[36] The fact that Section 8(b) (1) (A) does not provide the Board with specific standards to be applied in determining the reasonableness of a union fine, while Section 8(b) (5) does include several express standards, does not detract from the N.L.R.B.'s authority under 8(b) (1) (A). See N.L.R.B. v. Radio and Television Broadcast Engineers Union, 364 U. S. 573, 582-583, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961). "Experience and common sense will supply the grounds for the performance of this job," which we have concluded was implicitly entrusted by Congress to the Board. 364 U.S. at 583, 81 S.Ct. at 336.
 
 
 42
 *****
 
 
 43
 * * *
 
 
 44
 The Board must remember that a fine imposed for the violation of a legitimate union rule should be viewed as presumptively protective, and therefore privileged, when the amount of the fine, taking into account the character and importance of the ends served by the rule being enforced, is reasonably related to the need for protection. On the other hand, if the amount of the fine is such as to be inordinately disproportionate to the needed protection, an inference is warranted that the fine was imposed upon the member, not in vindication of a legitimate union interest, but rather as a reprisal for his having exercised a statutorily protected right. In the latter situation, as we have previously indicated, the fine would be "coercive" within the meaning of Section 8(b) (1) (A) of the Act. In determining whether an imposed fine is privileged or prohibited, due to its size, many factors may properly be considered by the Board. We shall mention several obvious factors which might be considered on remand, along with others the Board may consider to be applicable.
 
 
 45
 The reasonableness of a fine would necessarily have to be determined in light of the circumstances leading to its imposition. Such factors as the compensation received by the strikebreakers, the level of strike benefits made available to the striking employees, the individual needs of the persons being disciplined, the detrimental effect of the strikebreaking upon the effectiveness of the strike effort, the length of time of the work stoppage, the strength of the particular union involved, the availability of other less harsh union remedies, and many other similar considerations would clearly be relevant.
 
 
 46
 One additional consideration is worthy of mention. In its original Scofield decision, 145 NLRB 1097, 1104 (1964), the Board expressly indicated that a union had no right to impose any penalty which would "impair the member's status as an employee." This prohibition against union disciplinary action adversely affecting an employee's employment status has been approved by the Supreme Court. See N.L.R.B. v. Allis-Chalmers Mfg. Co., supra, 388 U.S. at 195, 87 S.Ct. 2001; Scofield v. N.L.R.B., supra, 394 U.S. at 423, 428, 89 S.Ct. 1154. While this principle clearly prohibits a union from seeking the suspension or termination of an employee by his employer due to his strikebreaking,[37] its implications may have further application which might be relevant to the present case. Where a disciplinary fine is unreasonably excessive, it may possibly affect the employee's employment status as adversely-and possibly even more adversely-as an illegally obtained employment suspension. On remand, the Board might also consider this protective policy of the Act in determining the reasonableness of the fines in question under Section 8(b) (1) (A).[38]
 
 
 47
 *****
 
 
 48
 * * *
 
 
 49
 *****
 
 
 50
 * * *III
 
 Labor Board Remedy
 
 51
 Although we are remanding this case to the N.L.R.B. for further consideration of the reasonableness question, it is apparent that the other aspects of the Board's decision below should be immediately affirmed. As was noted earlier in this opinion, the cease and desist order prohibiting further Union action pertaining to post-resignation strike-breaking conduct is granted enforcement. A more difficult question arises with respect to the affirmative aspects of the Board's decision.
 
 
 52
 "In Sec. 10(c) of the Act[39] Congress has given the Board broad power to fashion remedies to effectuate the policies of the Labor Act. So long as the Board exercises responsibility in its judgment, courts should not interfere with its remedy, since this is 'peculiarly a matter for administrative competence.' Phelps-Dodge Corp. v. NLRB, 313 U.S. 177, at 194, [61 S.Ct. 845, at 852, 85 L.Ed. 1271] . . . (1941)."[40] "The Board's power to fashion remedies places a premium upon agency expertise and experience, and the broad discretion involved is for the agency and not the court to exercise." Amalgamated Clothing Workers of America v. N.L.R.B., 125 U.S.App.D.C. 275, 281, 371 F.2d 740, 746 (1966).[41]
 
 
 53
 With these considerations in mind, we clearly must affirm that part of the Board's order which requires the Union to reimburse the approximately 35 employees who apologized and pledged loyalty, thereby obtaining a reduction in their respective penalties, for any amounts paid which were based upon post-resignation strikebreaking earnings.[42] We similarly affirm that portion of the order requiring the total reimbursement of any fines paid by employees who effectively resigned before engaging in any strikebreaking activity.
 
 
 54
 With respect to the Board's order as it relates to the remaining employees who resigned, the Board established a reimbursement formula which pro rated each employee's respective fine, thereby limiting the collectable portion to that part which reflects the amount of pre-resignation conduct. It obviously believed that this was the most reasonable manner in which to rectify the effects of the Union's unfair labor practice with respect to these persons.
 
 
 55
 The utilization of remedial formulas has been approved by the Supreme Court. N.L.R.B. v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 289, 97 L.Ed. 377 (1953). Keeping in mind our limited review function, we are unable to conclude that "the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric & Power Co. v. N.L.R.B., 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). "While it is true that [such] a retroactive order might afford the employees a better position . . . the Board can hardly be said to be effectuating policies beyond the purposes of the Act by resolving the doubt against the party who violated the Act." Leeds & Northrup Co. v. N.L.R.B., 391 F.2d 874, 880 (3rd Cir. 1968).[43] We therefore must affirm this portion of the Board's affirmative reimbursement order.
 
 
 56
 The case is remanded to the Labor Board for further consideration of the questions relating to the reasonableness of the fines imposed by the Union.
 
 
 57
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d) (1970)
 
 
 [1]
 At the time of the execution of the 1963-1965 agreement, Booster Lodge No. 405 was not yet in existence. Boeing's Michoud, Louisiana plant, with which we are concerned in this case, was considered to be a "remote location" unit, identified with the "primary location" unit at Seattle-Renton, Washington. Therefore, the production and maintenance employees in the Michoud unit were represented by Aeronautical Industrial District Lodge No. 751, I.A.M., AFL-CIO, of Seattle, a signatory to the above-mentioned contract with Boeing. Booster Lodge No. 405 came into existence sometime later in 1963, with jurisdiction over the Michoud plant, but the bargaining agreement was not modified to reflect this occurrence
 
 
 [2]
 The Union objected below to the fact that notices of resignation were sent to District Lodge 751, rather than to Booster Lodge 405. However, since Booster Lodge 405 was not a party to the original 1963-1965 agreement, as explained in footnote 1, supra, it is clear that the employees who notified District Lodge 751 were attempting to comply with the applicable contractual requirements. Furthermore, District Lodge 751 notified Booster Lodge 405 of all resignations it received. We thus see no validity in the objection
 
 
 [3]
 Employees who worked during the strike earned between $2.38 and $3.63 per hour, or between $95 and $145 per 40-hour week. In some instances, earnings during the strike period were supplemented by the inclusion of bonus or premium rates for weekend and overtime work
 
 
 [4]
 29 U.S.C. Sec. 158(b) (1) (A) (1970), which provides:
 (b) It shall be an unfair labor practice for a labor organization or its agents-
 (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein;
 29 U.S.C. Sec. 157 (1970) provides:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title.
 
 
 [5]
 See n. 4, supra
 
 
 [6]
 For another good analysis of the legislative history of Sec. 8(b) (1) (A), see National Maritime Union, 78 NLRB 971, 982-987 (1948), enfd., 175 F.2d 686 (2nd Cir. 1949), cert. denied, 338 U.S. 954, 70 S.Ct. 492, 94 L.Ed. 589 (1950)
 
 
 [7]
 The Company has asked this court to overrule Allis-Chalmers in order to force reconsideration of the union discipline area by the Supreme Court, but that is not our function. We recognize that "the Supreme Court should retain the exclusive privilege of overruling its own decisions, save perhaps when opinions already delivered have created a near certainty that only the occasion is needed for pronouncement of the doom." Salerno v. American League of Professional Baseball Clubs, 429 F.2d 1003, 1005 (2nd Cir. 1970), cert. denied, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971). In light of Scofield and Marine Workers, any argument for such reconsideration must be addressed to the Supreme Court itself. See U. S. Gypsum Co. v. United Steelworkers of America, 384 F.2d 38, 42-44 (5th Cir. 1967), cert. denied, 389 U.S. 1042, 88 S.Ct. 783, 19 L.Ed.2d 832 (1968); United States v. Ullman, 221 F.2d 760, 762 (2nd Cir. 1955), affd., 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956)
 
 
 [8]
 See Part II, infra, regarding the effect of the "reasonableness" of the fines imposed on their legality under Sec. 8(b) (1) (A)
 
 
 [9]
 In Allis-Chalmers, all of the persons disciplined by the union enjoyed full membership status. Thus the Court was not required to decide what obligations vis-a-vis the union a person would be under where he was not a full member, but only a "limited member" who merely paid dues and fees in accordance with an appropriate union-security agreement. 388 U.S. at 197, 87 S.Ct. 2001. See 29 U. S.C. Sec. 158(a) (3) (1970); N. L. R. B. v. General Motors Corp., 373 U.S. 734, 742, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963). Since the contracts involved in the instant case only contained maintenance-of-membership provisions, employees were either full members or total non-members. For this reason, we too intimate no view regarding the obligations which a union may lawfully impose on a person whose only ties with the labor organization are his payment of dues and fees
 
 
 [10]
 "[N]o employee is subject to union rules if he chooses to forego the privileges and duties of union membership." Silard, Labor Board Regulation of Union Discipline After Allis-Chalmers, Marine Workers and Scofield, 38 Geo.Wash.L.Rev. 187, 190 (1969). See International Association of Machinists and Aerospace Workers, Local Lodge 504, 185 NLRB No. 22, 75 LRRM 1008 (1970). Since unions are only authorized to impose discipline where legitimate internal affairs are concerned, N. L. R. B. v. Allis-Chalmers Mfg. Co., supra; Scofield v. N. L. R. B., supra; N. L. R. B. v. Industrial Union of Marine etc. Workers, 391 U.S. 418, 424, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968); Local 138, International Union of Operating Engineers, 148 NLRB 679, 682 (1964), it is clear that any effort to fine non-members would constitute an attempt to affect external activities, an area in which Congress did not intend to permit such union regulation. This was correctly recognized by the N. L. R. B. in this case
 
 
 [11]
 A resignation acts to terminate the existing relationship so far as the incursion of future obligations is concerned. Previously established or perfected liabilities survive the termination. See 5A Corbin, Contracts Sec. 1229, pp. 508-510 (1964)
 
 
 [12]
 This would, of course, include the approximately 61 persons who resigned from the Union before engaging in any strike-breaking activity, as well as the 58 persons discussed previously, who resigned during the period of their strikebreaking, so far as their actions undertaken after they effectively resigned are concerned
 
 
 [13]
 1 Corbin, Contracts Sec. 95, p. 396 (1963)
 
 
 [14]
 Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049, 1059-1061 (1951), and see cases cited therein
 
 
 [15]
 29 U.S.C. Sec. 157 (1970). See n. 4, supra
 
 
 [16]
 See 446 F.2d at 372 n. 5, wherein the First Circuit distinguished the facts present in the instant case from those present in Granite State
 
 
 [17]
 446 F.2d at 370 n. 2. In the present case, there is no evidence that the disciplined strikebreakers voted to strike
 
 
 [18]
 446 F.2d at 371
 
 
 [19]
 To the extent that the First Circuit's decision in Granite State may be read to support Booster Lodge 405's position here, we respectfully decline to follow it
 
 
 [20]
 We express no opinion herein concerning the legality of any union constitution or by-law provision expressly limiting the right of a member to resign during the period of an ongoing strike. Compare N. L. R. B. v. International Union, U.A.W., 320 F.2d 12 (1st Cir. 1963). We similarly intimate no view regarding the legality of any such provision expressly imposing a continuing obligation on any resigning member to refrain from strikebreaking during a work stoppage which was properly commenced prior to the time of the resignation
 
 
 [21]
 It is clear, as the Board has recognized, that the "resignations were effective upon receipt of notification by the Union." Local 1012, U.E., 187 NLRB No. 46, 76 LRRM 1038 (1970) (emphasis supplied). See Belle-Moc, Inc., 81 NLRB 6, 7 (1949); Koenig Bros., 108 NLRB 304 (1954); N. L. R. B. v. Vapor Recovery Systems Co., 311 F.2d 782, 785 (9th Cir. 1962). Any questions which may possibly arise concerning the effective dates of particular employee resignations can either be determined by the Board on remand of the reasonableness issue, in accordance with Part II of this opinion, or, if the N. L. R. B. prefers, such problems may be left for resolution at the compliance stage or in supplemental proceedings. United Steelworkers of America, Local 5571 v. N. L. R. B., 130 U.S.App. D.C. 369, 373, 401 F.2d 434, 438 (1968), cert. denied, 395 U.S. 946, 89 S.Ct. 2020, 23 L.Ed.2d 465 (1969). See American Fire Apparatus Co. v. N. L. R. B., 380 F.2d 1005, 1007 (8th Cir. 1967); N. L. R. B. v. International Longshoremen's etc. Union, Local 12, 378 F.2d 125, 130 (9th Cir. 1967), cert. denied, 389 U.S. 846, 88 S.Ct. 104, 19 L.Ed.2d 113 (1967); N. L. R. B. v. Darling & Co., 420 F.2d 63, 66 (7th Cir. 1970)
 
 
 [22]
 This would include the Union's effort not only to discipline those employees who had resigned from membership before engaging in any strikebreaking, but also the organization's imposition of fines on those who resigned during the period of their strikebreaking, to the extent that such discipline was imposed as a result of their post-resignation conduct
 
 
 [23]
 The fact that the fines imposed upon the employees for conduct undertaken after they had severed their ties with the Union might not have been collectable in a subsequent collection suit, does not detract from the fact of their coerciveness at the time they were imposed. See N. L. R. B. v. American Bakery and Confectionery Workers, Local 300, 411 F.2d 1122, 1126 (7th Cir. 1969). See also Local Union No. 167, Progressive Mine Workers of America v. N. L. R. B., 422 F.2d 538, 542 (7th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2198, 26 L.Ed.2d 560 (1970)
 
 
 [24]
 This result also supports the Board's conclusion that the Union fines which were imposed upon the approximately 35 persons who apologized and pledged loyalty, should be confined to 50% of their pre-resignation strikebreaking earnings, since any attempt to enforce the discipline with respect to post-resignation remuneration could be reasonably construed as an effort to punish the very conduct which we have held the Union may not so regulate. "While it is true that [the Board's] retroactive order might afford [these] employees a better position . . . the Board can hardly be said to be effectuating policies beyond the purposes of the Act by resolving the doubt against the party who violated the Act." Leeds & Northrup Co. v. N. L. R. B., 391 F.2d 874, 880 (3rd Cir. 1968). We therefore grant enforcement to that part of the Board's order which limits enforcement of such fines to 50% of pre-resignation earnings, which we believe results in the enforcement of a reasonable fine. Similarly, the prohibition against holding Union office, which, with respect to these persons, was calculated on a pro rata basis reflecting the number of strikebreaking days each worked, must necessarily also be restricted so that the length of such prohibitions will only reflect preresignation activity. See expanded discussion of the Board's remedial authority in Part III of this opinion, infra
 
 
 [25]
 Appeal is now pending before the Ninth Circuit, sub nom. David O'Reilly v. N. L. R. B., No. 26,892
 
 
 [26]
 We emphasize the fact that in the instant case, the Union not only threatened to utilize court action to enforce the fines imposed, but in several instances, actual collection suits were begun. Under such circumstances, we believe that the reasonableness of the fines in question is highly relevant to the question of their legality under Sec. 8(b) (1) (A). We intimate no view regarding the need for an examination of the reasonableness of disciplinary fines where the only enforcement mechanism contemplated by the union involves the expulsion of the individual from the union
 
 
 [27]
 Although the Union has argued that the aggrieved employees should not have the right to have a Board determination concerning the reasonableness of the fines imposed, due to the fact that they have not exhausted all available internal Union remedies, we reject this contention. An individual need not, in all cases, exhaust all internal union procedures before seeking the services of the N. L. R. B. See N. L. R. B. v. Industrial Union of Marine etc. Workers, 391 U.S. 418, 88 S. Ct. 1717, 20 L.Ed.2d 706 (1968); Local 138, International Union of Operating Engineers, 148 NLRB 679 (1964). The imposition of such a requirement in this case concerning the reasonableness issue would not, in our opinion, best serve the interests of justice or further the objectives of the N. L. R. A. The issue here involves public policy and thus transcends the pure internal affairs of the Union. 391 U.S. at 422-428, 88 S.Ct. at 1717
 
 
 [28]
 Justice White, in his concurring opinion, observed:
 [S]ince expulsion would in many cases -certainly in this one involving a strong union-be a far more coercive technique for enforcing a union rule and for collecting a reasonable fine than the threat of court enforcement, there is no basis for thinking that Congress, having accepted expulsion as a permissible technique to enforce a rule in derogation of Sec. 7 rights, nevertheless intended to bar enforcement by another method [court action] which may be far less coercive.
 388 U.S. at 198, 87 S.Ct. at 2016 (emphasis supplied). It is also informative to note the express interpretation given to the Allis-Chalmers opinion by the dissenting members of the Court: "[T]he Court's holding boils down to this: a court-enforced reasonable fine for nonparticipation in a strike does not 'restrain or coerce' an employee in the exercise of his right not to participate in the strike." 388 U.S. at 200-201, 87 S.Ct. at 2017 (dissenting opinion of Black, J.) (emphasis supplied).
 
 
 [29]
 Even the attorney who argued Allis-Chalmers for the union before the Supreme Court has recognized this limitation in the Court's decision. He has indicated that Allis-Chalmers only determined that "a union suit to collect a reasonable fine imposed on a member for violating a 'no strikebreaking' rule does not violate section 8(b) (1)." Silard, Labor Board Regulation of Union Discipline After Allis-Chalmers, Marine Workers and Scofield, 38 Geo.Wash.L.Rev. 187, 190 (1969) (emphasis supplied)
 
 
 [30]
 The question of the extent to which union action for enforcement of disciplinary penalties is pre-empted by federal labor law is not before this court, and we intimate no view concerning the resolution of this complex issue. Compare San Diego Building Trades Council etc. v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), with Linn v. United Plant Guard Workers, Local 114, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). See N. L. R. B. v. Allis-Chalmers Mfg. Co., supra, 388 U.S. at 197 n. 37, 87 S.Ct. 2001
 
 
 [31]
 See cases cited 70 Yale L.J. at 175 n. 3. "Unless the rule or its enforcement impinges on some policy of the federal labor law, the regulation of the relationship betwen union and employee is a contractual matter governed by local law." Scofield v. N.L.R.B., supra, 394 U.S. at 426 n. 3, 89 S.Ct. at 1156
 
 
 [32]
 N.L.R.B. v. Allis-Chalmers Mfg. Co., supra, 388 U.S. at 193 n. 32, 87 S.Ct. at 2013, quoting from Summers, Legal Limitations on Union Discipline, 64 Harv.L. Rev. 1049, 1078 (1951). For some examples of state court willingness to examine the reasonableness of union disciplinary fines, see: North Jersey Newspaper Guild, Local 173 v. Rakos, 110 N.J.Super. 77, 264 A.2d 453 (1970); L. A. Newspaper Guild, Local 69 v. Armenta, 73 LRRM 2078 (Cal.Sup.Ct., App. Dept.1969); Walsh v. Communications Workers of America, 259 Md. 608, 271 A.2d 148 (Md.Ct. of App.1970); McCauley v. Federation of Musicians, Local 294, 26 LRRM 2304 (Pa.Ct. of Com.Pls. 1950)
 
 
 [33]
 Although the Union has cited language in U. O. P. Norplex, Div. of Universal Oil Products Co. v. N.L.R.B., 445 F.2d 155, 158 (7th Cir. 1971), stating that "[t]he reasonableness of . . . fines is a matter for the state court to determine should the Union seek judicial enforcement of the fines," in support of its contention that this issue is outside the scope of the Board's authority, this statement is clearly not apposite to the present case. The Court was there concerned with whether the subject of internal union fines was a mandatory subject for collective bargaining, and it recognized that "even if the fines were excessive, the remedy would be for the company to file an 8(b) (1) (A) charge against the union, not to try to convert an otherwise non-mandatory subject of bargaining into a 'term or condition of employment."' 445 F.2d at 158 n. 7 (emphasis supplied). The Boeing Company followed the exact procedure suggested
 
 
 [34]
 We emphasize the fact that "[t]he function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board . ." N.L.R.B. v. Truck Drivers Union, etc., 353 U.S. 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676 (1957). This is the very function which the Board is being asked to perform here
 
 
 [35]
 29 U.S.C. Sec. 158(b) (5) (1970), which provides:
 (b) It shall be an unfair labor practice for a labor organization or its agents-
 (5) to require of employees covered by an agreement authorized under subsection (a) (3) [, i. e., a union-security provision,] the payment, as a condition precedent to becoming a member of such organization, of a fee in an amount which the Board finds excessive or discriminatory under all the circumstances. In making such a finding, the Board shall consider, among other relevant factors, the practices and customs of labor organizations in the particular industry, and the wages currently paid to the employees affected; (emphasis supplied)
 
 
 [36]
 See, e. g., Longshoremen, I.L.A., Local 1419, 186 NLRB No. 94, 75 LRRM 1411 (1970), wherein a violation of Sec. 8(b) (5) was found. See also N.L.R.B. v. Television & Radio Broadcasting Studio Employees, Local 804, 315 F.2d 398 (3rd Cir. 1963)
 
 
 [37]
 See 29 U.S.C. Sec. 158(b) (2) (1970), which provides, inter alia:
 (b) It shall be an unfair labor practice for a labor organization or its agents-
 (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)
 (3). . . .
 29 U.S.C. Sec. 158(a) (3) (1970), provides, inter alia:
 (a) It shall be an unfair labor practice for an employer-
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . .
 
 
 [38]
 We, of course, recognize that Section 8(b) (2) was enacted to prevent a union from improperly interfering with an individual's employment relationship through his employer. However, this does not detract from the fact that this provision evidences a Congressional desire to protect an employee from any unreasonable adverse affect on his employment status by a labor organization. See N.L. R.B. v. Allis-Chalmers Mfg. Co., supra, 388 U.S. at 195, 87 S.Ct. 2001; Scofield v. N.L.R.B., supra, 394 U.S. at 123, 128, 89 S.Ct. 1154
 
 
 [39]
 29 U.S.C. Sec. 160(c) (1970) authorizes the Board to require the perpetrator of an unfair labor practice "to take such affirmative action . . . as will effectuate the policies of this [Act] . . ."
 
 
 [40]
 Office and Professional Employees International Union, Local 425 v. N.L.R.B., 136 U.S.App.D.C. 12, 19-20, 419 F.2d 314, 321-322 (1969). See Franks Bros. Co. v. N.L.R.B., 321 U.S. 702, 704, 64 S.Ct. 817, 88 L.Ed. 1020 (1944); Fibreboard Paper Products Corp. v. N.L.R.B., 379 U.S. 203, 215-217, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). See also N.L.R.B. v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953)
 
 
 [41]
 See cases cited 125 U.S.App.D.C. at 281 n. 5, 371 F.2d at 746 n. 5
 
 
 [42]
 See n. 24, supra, for further discussion of the remedy pertaining to these persons
 
 
 [43]
 We are cognizant of the fact that the Union's $450.00 fine was imposed upon all strikebreakers-except those who apologized and pledged loyalty-regardless of the number of days of strikebreaking engaged in by each. Although the Union argues that this fact indicates that no pro rata reduction should have been required by the Board with respect to these employees, we recognize the N.L.R.B.'s obvious desire to formulate an affirmative order which would rectify the Union's improper attempt to punish post-resignation conduct. We cannot conclude that the Board has abused its broad discretionary authority in this area. See N.L. R.B. v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 289, 97 L.Ed. 377 (1953)