**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GRANITE STATE JOINT BOARD, TEXTILE WORKERS UNION OF AMERICA, LOCAL 1029, AFL–CIO, Respondent.**

**No. 71–1063.**

United States Court of Appeals, First Circuit.

June 29, 1971.

Warren M. Davison, Deputy Asst. General Counsel, with whom Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Marvin Roth, Attorney, Washington, D. C., were on brief, for petitioner.

Harold B. Roitman, Boston, Mass., for respondent.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

This case comes to us on application for enforcement of a Labor Board order against respondent, Granite State Joint Board, Textile Workers Union of America, Local 1029, AFL–CIO (the union). The Board found that the union committed a § 8(b) (1) (A) unfair labor practice[1] when it sought judicial enforcement of fines against thirty-one union members who, during the course of a lawful, union-authorized strike, resigned from the union and crossed the picket line to return to work.

The union represents the production and maintenance employees of the International Paper Box Machine Company in Nashua, New Hampshire. The collective bargaining agreement which was in effect between September 20, 1965, and September 20, 1968, included a "maintenance of membership clause," which provided that all employees who belonged to the union on September 20, 1965, or joined during the contract period would remain members in good standing for the duration of the contract. Each employee applying for union membership was required to sign a "dues check-off" authorization form. This form expressly made the check-off authorization irrevocable except during specified annual ten-day periods.

Shortly before the expiration of the collective bargaining agreement, while negotiations were still in progress, the union membership voted to strike if no agreement was reached by September 20. The trial examiner found that "[p]ractically all the members" attended the strike vote meeting and only one member dissented from the decision to strike. A day or two after the strike began the union membership voted unanimously to levy a $2,000 fine on anyone aiding or abetting the company during the strike.[2]

---

1. Section 8(b) provides in relevant part:
"It shall be an unfair labor practice for a labor organization or its agents—
"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 of this title: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein;
* * *."

Section 7 provides:
"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, *and shall also have the right to refrain from any or all of such activities* except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3) of this title." (Emphasis added.)

2. This finding suggests that most of the employees who subsequently resigned and returned to work had probably voted in favor of the strike and very likely for the fines as well. The Board conceded at oral argument that all thirty-one had voted to strike. The only direct evidence on the record before us is the testimony of Maurice Kimball II, who was the second employee to resign. He testified that he had voted for the strike and that he was present at the meeting when the fine was voted, and did not oppose it.

On November 5 and 25, 1968, respectively, employees Radziewicz and Kimball sent letters of resignation to the union. In both instances the union refused to accept the tendered resignations and warned the employees about the $2,-000 fine. Radziewicz returned to work secretly for a few days before Thanksgiving but stopped working after receiving a second warning about the fine. The two employees then filed unfair labor practice charges against the union on the ground that the threats of fines violated § 8(b) (1) (A). The trial examiner ruled that no unfair labor practice had been committed. He added, however, that in his opinion, although NLRB v. Allis-Chalmers Manufacturing Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L. Ed.2d 1123 (1967), established a union's right to obtain judicial enforcement of fines levied against members who cross a picket line, Radziewicz and Kimball could not be fined under *Allis-Chalmers* because they had effectively resigned from union membership. The company thereupon informed all striking employees about the trial examiner's decision. The union, in turn, wrote to each member that the company's information was erroneous and that the union's right to fine strikebreakers has been upheld by the Supreme Court. During the months that followed, twenty-nine additional employees resigned from the union and returned to work.

Each of the thirty-one employees who returned to work was tried at a union hearing and fined an amount equal to a day's pay for each day worked during the strike.[3] All received notices regarding their hearings, but none attended and none paid the fine. The union then commenced actions to collect the fines in the New Hampshire state courts. While these actions were pending, the instant unfair labor practice charges were filed. In conformance with his earlier opinion, the trial examiner ruled that, because these employees had effectively resigned from the union before crossing the picket line, the union fines and attempted judicial enforcement violated their § 7 right to refrain from striking and constituted a § 8(b) (1) (A) unfair labor practice.[4] The Board affirmed his rulings, relying on its more extensive opinion in Booster Lodge No. 405, IAM, 185 N.L.R.B. No. 23 (1970) (*Boeing*), review pending, No. 24,687 (D.C. Cir.), which it had recently issued. *Boeing* and the instant case are the only two in which the Board has ruled on this question and this is therefore a case of first impression before this court.

■ In its brief, the union takes the position that these thirty-one employees have never effectively resigned. First, it argues that questions of "acquisition and retention of membership" are internal union matters and therefore beyond the province of the Board, citing the proviso in § 8(b) (1) (A), note 1 *supra*, and UAW, Local 283, 145 N.L.R.B. 1097 (1964) (Wisconsin Motor Corp.), review denied *sub nom.* Scofield v. NLRB, 393 F. 2d 49 (7th Cir. 1968), aff'd, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969). But the general principle that the union-employee relationship is a "federally unentered enclave" does not apply where a union "rule or its enforcement impinges on some policy of the federal labor law." *Scofield, supra*, 394 U.S. at 426 n.3, 89 S.Ct. at 1156. Since § 8(b) (1) (A) makes certain actions taken by unions *vis-a-vis* their employees unfair labor practices, it is within the province of the Labor Board and

---

3. As the trial examiner noted, *Allis-Chalmers, supra*, does not make clear whether an unreasonably severe union fine would constitute a § 8(b) (1) (A) unfair labor practice. Since the Board's ruling below is not predicated on reasonableness, we need not reach that issue here.

4. The trial examiner also ruled that state court suits brought by the union to recover money advanced to these employees during the strike did not violate § 8(b) (1) (A). In many instances the union had paid premiums to keep employees' group life insurance policies current during the strike, and some had received direct cash payments from the union.

the federal courts to determine when that provision has been violated.

The union concedes that its constitution and by-laws contain no express provision limiting members' rights to resign. Absent an express provision to the contrary, the courts have interpreted union constitutions to allow voluntary resignations at any time. NLRB v. Mechanical and Allied Production Workers Local 444, 427 F.2d 883 (1st Cir. 1970); Communications Workers v. NLRB, 215 F.2d 835, 838–839 (2d Cir. 1954); cf. NLRB v. International Union, UAW, 320 F.2d 12 (1st Cir. 1963) (*Paulding*). Similarly, since the collective bargaining agreement had expired, the "retention of membership" provision was no longer in effect during the strike. The union argues that its established practice was to accept resignations only during the annual ten-day "escape period" during which employees were allowed to revoke their "dues check-off" authorizations, but, as the trial examiner pointed out, there was no evidence that the employees knew of this practice or that they had consented to this limitation on their right to resign.

The union contends that, even if the resignations effectively severed ties with the union for most purposes, the September 1968 strike vote bound these thirty-one employees to support this particular strike until its conclusion.[5] An analogy is drawn to the "charitable subscription" cases where some courts have held that a promise by A to donate funds to a charity is binding on A if others have made similar promises in reliance on his promise. *E. g.,* Young

Men's Christian Association v. Estill, 140 Ga. 291, 78 S.E. 1075 (1913). *See* 1A A. Corbin, Contracts § 198, at 210 (1963). As Corbin points out, the "mutual subscriptions" argument is particularly compelling in a business context where donative intent is presumably absent. *Id.* at 212; *see* Martin v. Meles, 179 Mass. 114, 60 N.E. 397 (1901) (Holmes, C. J.). We can imagine a case involving three hypothetical employees whom we shall call Jones, Smith and Parks. Initially, Jones is anxious to strike but Smith and Parks hesitate, finally acquiescing on the condition that they all agree to stick it out for the duration of the strike. We suggest that this kind of mutual reliance is implicit in all strike votes; many employees would hesitate to forego several weeks or months of pay if they knew their cohorts were free to cross the picket line at any time merely by resigning from the union.[6] An alternative theory, also suggested by the subscription cases, is that the union can enforce an employee's agreement to strike since it has embarked on the strike in reliance on his promise to honor it.

The union argues that the employee who agrees to strike should be likened to a volunteer for military service who, once he has enlisted, is no longer free to resign from his obligations and duties in midpassage. This approach receives strong support from *Allis-Chalmers, supra,* where the Court said:

"Integral to this federal labor policy has been the power in the chosen union to protect against erosion its status under that policy through reason-

---

5. Under this theory, the *Boeing* case, *supra,* may be distinguishable on its facts since in *Boeing* the fines were authorized by a general provision in a union constitution, rather than by a specific decision of the membership adopted in the context of a particular strike. In *Boeing* the Board emphasized that "the Union had not warned members about the possible imposition of disciplinary measures." Also, the *Boeing* opinion did not consider whether any of the employees who crossed the picket line had originally voted to

support the strike. We express no opinion, however, as to whether these distinctions are determinative.

6. It could be argued that the union's reliance on the "subscription cases" is inconsistent with its concession at oral argument that a majority · vote of the membership could terminate the strike at any time. But it would seem to have been implicit in the original strike vote that the obligation to strike would terminate once the majority voted to return to work.

able discipline of members who violate rules and regulations governing membership. *That power is particularly vital when the members engage in strikes.* The economic strike against the employer is the ultimate weapon in labor's arsenal for achieving agreement upon its terms, and '[*t*]*he power to fine or expel strikebreakers is essential if the union is to be an effective bargaining agent * * *.' " *Supra*, 388 U.S. at 181, 87 S.Ct. at 2009. (Emphasis added; footnotes omitted.)

■ In response, the Board concedes that the mutual subscription argument would be conclusive but for § 7 of the Act. *See* note 1 *supra*. Section 7, which was originally designed to assure employees the right to organize, bargain collectively, and engage in concerted activities, was amended by the Taft-Hartley Act in 1947 to give employees the added right "to refrain from any or all of such activities * * *." We are not persuaded, however, that the amendment to § 7 was intended to authorize mid-strike resignations. The plain meaning of the word "refrain" is "to keep oneself from doing, feeling, or indulging in something." It is synonymous with "abstain" and "forbear." Webster's Seventh New Collegiate Dictionary 720 (1967). This definition suggests that, although § 7 gives an employee the right to refuse to undertake and involve himself in union activities, it does not necessarily give him the right to abandon these activities in midcourse once he has undertaken them voluntarily. There is little legislative history regarding the amendment to § 7, but the conference committee report supports our interpretation. It states that the amendment "provides that employees are also to have the right to refrain *from joining* in concerted activities with their fellow employees if they choose to do so." H.R.Rep.No. 510, 80th Cong., 1st Sess.; 1947 U.S.Code Cong.Service, p. 1145. (Emphasis added.)

■ ■ The Board asserts that, in essence, this case presents a conflict between the policies set forth in *Allis-Chalmers* and those incorporated in the amended § 7. The Board takes the position that, where such a conflict exists, § 7 must prevail. But the policy of allowing unions to maintain strike discipline can be reconciled with the policy of allowing employees to refrain from concerted activities if the Act is interpreted to permit the waiver of § 7 rights by employees. Under this interpretation, employees who agreed to undertake specific union activities and obligations would be held to have waived their § 7 rights to refrain from those activities.[7] As noted, both the plain meaning and the legislative history of the amendment to § 7 support this interpretation.

We find further support for our decision not to enforce the Board's order in this case in the reasoning in *Allis-Chalmers, supra*. In that case the Court never reached the question of the proper interpretation of § 7, because it held that § 8(b) (1) (A) simply does not apply to judicial enforcement of union strikebreaking fines. The Court emphasized that Taft-Hartley was enacted in a context in which the union-member relationship was considered a matter of private contract, governed by state law. *Id.*, 388 U.S. at 182–183, 87 S.Ct. 2001. It stated that § 8(b) (1) (A) was intended to affect that relationship in only three areas: (1) coercion and

7. As the dissent noted in *Allis-Chalmers*, there is some suggestion in the Court's opinion in that case that "by joining a union an employee gives up or waives some of his § 7 rights." *Supra*, 388 U.S. at 200, 87 S.Ct. at 2017 (Black, J., dissenting). In the *Boeing* opinion, the Board said that, when an employee joins a union, "[w]ithout waiving his Section 7 right to refrain from concerted activities, he consents to the possible imposition of union discipline upon his exercise of that right." That proposition strikes us as "doublethink." Consent to imposition of a sanction is obviously equivalent to the waiver of a right. We therefore conclude that § 7 rights can be and are waived by employees in many situations.

threats of reprisal in the course of organizational campaigns, *id.* at 186–188, 87 S.Ct. 2001; (2) arbitrary actions by union leaders, *id.* at 188–189, 87 S.Ct. 2001; and (3) "coercion which prevented employees not involved in a labor dispute from going to work," *id.* at 189, 87 S.Ct. at 2011. There is no evidence in the legislative history of any intent that § 8(b) (1) (A) apply to union-employee agreements and obligations that have been undertaken voluntarily and without coercion.

In *Boeing* the Board took the position that Allis-Chalmers has been limited by NLRB v. Industrial Union of Marine & Shipbuilding Workers, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968), and Scofield v. NLRB, *supra*, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385. *Scofield* held that a union rule is valid unless that "rule invades or frustrates an overriding policy of the labor laws." *Id.*, 394 U.S. at 429, 89 S.Ct. at 1158. Since we have found a valid waiver of § 7 by these employees,[8] we conclude that no federal labor policy would be overridden by judicial enforcement of union fines in the context of this case. The Board relies on dictum in *Scofield* to the effect that

> " \* \* \* § 8(b) (1) leaves a union free to enforce a properly adopted rule which reflects a legitimate union interest, impairs no policy Congress has imbedded in the labor laws, and is reasonably enforced against union members who are free to leave the union and escape the rule." *Id.*, 394 U. S. at 430, 89 S.Ct. at 1158.

We do not understand this language to mean that union members must be "free to leave the union and escape the rule" at any time and under all circumstances. Indeed, we do not see how that interpretation could be correct since in *Scofield* itself the Court recognized that a valid union security clause was in effect at the time of the alleged unfair labor practice. *Id.*, 394 U.S. at 424 n.1, 89 S. Ct. 1154, 22 L.Ed.2d 385. The extent to which and the conditions under which union members must be free to resign has not been definitely resolved by the Court. In light of our analysis of the specific obligation to strike undertaken in this case, it is an issue we need not reach here.

The petition for enforcement is denied.

---

8. Since the record is somewhat equivocal on this point, *cf.* note 2 *supra*, it is conceivable that one or more employees will yet come to the Board with the claim that they did not attend either of the two strike vote meetings. We do not reach the question of whether employees in that position were free to abandon the strike at any time, whether their failure to resign at the beginning of the strike constituted ratification of the strike vote on their part, or whether their voluntary act in joining the union constituted such a "contract" as to bar such a claim.