NATIONAL LABOR RELATIONS BOARD *v.* GRANITE STATE JOINT BOARD, TEXTILE WORKERS UNION OF AMERICA, LOCAL 1029, AFL–CIO

No. 71–711.   Argued November 13, 1972—Decided December 7, 1972

DOUGLAS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 218. BLACKMUN, J., filed a dissenting opinion, *post*, p. 218.

*Norton J. Come* argued the cause for petitioner. With him on the brief were *Solicitor General Griswold, Allan A. Tuttle,* and *Peter G. Nash.*

*Harold B. Roitman* argued the cause and filed a brief for respondent.

*Milton Smith, Jerry Kronenberg,* and *Gerard C. Smetana* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging reversal.

*Plato E. Papps, Louis Poulton,* and *Bernard Dunau* filed a brief for the International Association of Machinists and Aerospace Workers, AFL–CIO, as *amicus curiae,* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondent is a union that had a collective-bargaining agreement with an employer which contained a maintenance-of-membership clause providing that members were, as a condition of employment, to remain in good standing "as to payment of dues" for the duration of the contract. Neither the contract nor the Union's constitution or bylaws contained any provision defining or limiting the circumstances under which a member could resign. A few days before the collective agreement expired, the Union membership voted to strike if no agreement was reached by a given date. No agreement was reached in the specified period, so the strike and attendant picketing commenced. Shortly thereafter, the Union held a meeting at which the membership resolved that any member aiding or abetting the employer during the strike would be subject to a $2,000 fine.

About six weeks later, two members sent the Union their letters of resignation. Six months or more later, 29 other members resigned. These 31 employees returned to work.

The Union gave them notice that charges had been made against them and that on given dates the Union would hold trials. None of the 31 employees appeared on the dates prescribed; but the trials nonetheless took place even in the absence of the employees and fines were imposed on all.[1] Suits were filed by the Union to collect the fines. But the outcome was not determined because the employees filed unfair labor practice charges with the National Labor Relations Board against the Union.

---

[1] Fines equivalent to a day's wages for each day worked during the strike were imposed.

The unfair labor practice charged was that the Union restrained or coerced the employees "in the exercise of the rights guaranteed in section 7." [2] See § 8 (b)(1) of the Act. [3] The Board ruled that the Union had violated § 8 (b)(1). 187 N. L. R. B. 636. The Court of Appeals denied enforcement of the Board's order. 446 F. 2d 369. The case is here on certiorari, 405 U. S. 987.

We held in *NLRB* v. *Allis-Chalmers Mfg. Co.*, 388 U. S. 175, that a union did not violate § 8 (b)(1) by fining members who went to work during a lawful strike authorized by the membership and by suing to collect the fines. The Court reviewed at length in that opinion the legislative history of §§ 7 and 8 (b)(1), and concluded by a close majority vote that the disciplinary measures taken by the union against its members on those facts were within the ambit of the union's control over its internal affairs. But the sanctions allowed were against those who "enjoyed full union membership." *Id.*, at 196.

Yet when a member lawfully resigns from the union, its power over him ends. We noted in *Scofield* v. *NLRB*,

---

[2] Section 7 provides in relevant part:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities . . . ." 61 Stat. 140, 29 U. S. C. § 157.

[3] Section 8 (b). "It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein . . . ." 61 Stat. 141, 29 U. S. C. § 158 (b).

394 U. S. 423, 429, that if a union rule "invades or frustrates an overriding policy of the labor laws the rule may not be enforced, even by fine or expulsion, without violating § 8 (b)(1)." On the facts, we held that *Scofield*, where fines were imposed on members by the union, fell within the ambit of *Allis-Chalmers*. But we drew the line between permissible and impermissible union action against members as follows:

> ". . . § 8 (b)(1) leaves a union free to enforce a properly adopted rule which reflects a legitimate union interest, impairs no policy Congress has imbedded in the labor laws, and is reasonably enforced against union members who are free to leave the union and escape the rule." *Id.,* at 430.

Under § 7 of the Act the employees have "the right to refrain from any or all" concerted activities relating to collective bargaining or mutual aid and protection, as well as the right to join a union and participate in those concerted activities. We have here no problem of construing a union's constitution or bylaws defining or limiting the circumstances under which a member may resign from the union.[4] We have, therefore, only to apply the law which normally is reflected in our free institutions—the right of the individual to join or to resign from associations, as he sees fit "subject of course to any financial obligations due and owing" the group with which he was associated. *Communications Workers* v. *NLRB,* 215 F. 2d 835, 838.

---

[4] Union-security arrangements requiring employees to pay dues, though not requiring membership, have been held not to be an unfair labor practice and therefore not an excuse for the employer to refuse to bargain collectively for such an agreement, at least where state law allows employees that option. *NLRB* v. *General Motors Corp.,* 373 U. S. 734.

The *Scofield* case indicates that the power of the union over the member is certainly no greater than the union-member contract. Where a member lawfully resigns from a union and thereafter engages in conduct which the union rule proscribes, the union commits an unfair labor practice when it seeks enforcement of fines for that conduct. That is to say, when there is a lawful dissolution of a union-member relation, the union has no more control over the former member than it has over the man in the street.

The Court of Appeals gave weight to the fact that the resigning employees had participated in the vote to strike. We give that factor little weight. The first two members resigned from the Union from one to two months after the strike had begun. The others did so from seven to 12 months after its commencement. And the strike was still in progress 18 months after its inception. Events occurring after the calling of a strike may have unsettling effects, leading a member who voted to strike to change his mind. The likely duration of the strike may increase the specter of hardship to his family; the ease with which the employer replaces the strikers may make the strike seem less provident. We do not now decide to what extent the contractual relationship between union and member may curtail the freedom to resign. But where, as here, there are no restraints on the resignation of members,[5] we conclude that the vitality of § 7 requires that the member be free to refrain in November from the

---

[5] The Union argues that its practice was to accept resignations of members only during an annual ten-day "escape period," during which time the employees were allowed to revoke their "dues check-off" authorizations. The Court of Appeals rejected that argument, saying there was no evidence that the employees knew of this practice or that they had consented to its limitation on their right to resign. 446 F. 2d 369, 372.

actions he endorsed in May and that his § 7 rights are not lost by a union's plea for solidarity or by its pressures for conformity and submission to its regime.

*Reversed.*

MR. CHIEF JUSTICE BURGER, concurring.

I join the Court's opinion because for me the institutional needs of the Union, important though they are, do not outweigh the rights and needs of the individual. The balance is close and difficult; unions have need for solidarity and at no time is that need more pressing than under the stress of economic conflict. Yet we have given special protection to the associational rights of individuals in a variety of contexts; through § 7 of the Labor Act, Congress has manifested its concern with those rights in the specific context of our national scheme of collective bargaining. Where the individual employee has freely chosen to exercise his legal right to abandon the privileges of union membership, it is not for us to impose the obligations of continued membership.

MR. JUSTICE BLACKMUN, dissenting.

On September 14, 1968, just six days prior to the expiration of the collective-bargaining agreement then in force, the Union membership voted to strike. The strike began September 20. On September 21 the membership unanimously[1] adopted a resolution that anyone aiding or abetting the company during the strike would be subject to a fine not exceeding $2,000. Each of the employees involved here voted for both of these resolutions

---

[1] There is a mild discrepancy in the record as to whether the vote on the strikebreaking resolution was unanimous. In his first opinion, the trial examiner indicated that the vote was unanimous. (Pet. for Cert. 23a.) In a second opinion, the examiner indicated that there was one dissenting vote.

and participated in the strike.[2] Each was a member of the Union during the period in which the votes were taken and the strike began. Membership was voluntary, and persons who became members were free to resign at any time.[3]

In *NLRB* v. *Allis-Chalmers Mfg. Co.,* 388 U. S. 175 (1967), this Court held that a union could enforce in a state court a fine levied against a strikebreaking member. The Court noted that, at the time § 8 (b)(1)(A) was enacted, "provisions defining punishable conduct and the procedures for trial and appeal constituted part of the contract between member and union and that '[t]he courts' role is but to enforce the contract.'" *Id.,* at 182. The scope of § 8 (b)(1)(A) was confined to restraint or coercion visited upon union members in the course of organizational campaigns, *id.,* at 186–188, or by arbitrary and undemocratic union leadership, *id.,* at 188–189, or by coercion that prevented employees not in the bargaining

---

[2] The parties stipulated before the trial examiner that all 31 employees participated in the strike vote, and voted in favor of the strike. App. 45. It is less clear whether each of the employees voted in favor of the fine. These are matters that would be resolved in the state court proceedings.

[3] The Union and the company had no union shop clause in the 1965 collective-bargaining agreement. The Union constitution and bylaws contained no express provision limiting members' rights to resign. In the absence of such a provision, the members could submit voluntary resignations at any time. *NLRB* v. *Mechanical & Allied Production Workers, Local 444,* 427 F. 2d 883 (CA1 1970); *Communications Workers* v. *NLRB,* 215 F. 2d 835, 838–839 (CA2 1954). And, as the collective-bargaining agreement was no longer in force at the time of the resignations, the retention-of-membership provision was no longer in effect. Finally, the trial examiner found no evidence that the members knew of the Union's "established practice" of accepting resignations only during the annual 10-day escape period, and in the absence of such knowledge that practice cannot be enforced.

unit from going to work, *id.,* at 189 and n. 25. That section was not viewed as prohibiting "the imposition of fines on members who decline to honor an authorized strike and attempts to collect such fines." *Id.,* at 195. Finding, as a consequence, no restraint or coercion by the union on the employees' § 7 rights, the Court sustained the union's power to enforce the strikebreaking fines in state court.

Today the Court reaches an opposite result on the basis of two facts: "Neither the contract nor the Union's constitution or bylaws contained any provision defining or limiting the circumstances under which a member could resign"; and the strikebreaking employees resigned before returning to work, thus effecting "a lawful dissolution of [the] union-member relation." As to the first fact, I am not convinced that the presence of a provision in the union constitution, for example, should always make a difference with respect to the existence of an enforceable, voluntary obligation on the part of an employee to refrain from strikebreaking activity. In fact, it seems likely that the three factors of a member's strike vote, his ratification of strikebreaking penalties, and his actual participation in the strike, would be far more reliable indicia of his obligation to the union and its members than the presence of boilerplate provisions in a union's constitution. As to the second fact, while membership in the union may well have implications with respect to the union's power over the resigned member, I am hard put to understand why this fact, alone, results in restraint or coercion under § 8 (b)(1)(A), when the imposition of fines for similar conduct by members, and their enforcement in state courts, does not fall within that section's prohibition. *NLRB* v. *Allis-Chalmers Mfg. Co., supra.* Are an employee's § 7 rights any more at stake here than they are where, as in *Allis-Chalmers,* the

employee engages in the same activity but stops short of resigning from the union?

I cannot join the Court's opinion, which seems to me to exalt the formality of resignation over the substance of the various interests and national labor policies that are at stake here. Union activity, by its very nature, is group activity, and is grounded on the notion that strength can be garnered from unity, solidarity, and mutual commitment. This concept is of particular force during a strike, where the individual members of the union draw strength from the commitments of fellow members, and where the activities carried on by the union rest fundamentally on the mutual reliance that inheres in the "pact." Similar mutual commitments arising from perhaps less compelling circumstances have been held to be legally enforceable. See 1A A. Corbin, Contracts § 198, pp. 210–212 (1963).

A union's power to enforce these mutual commitments on behalf of its members is of particular importance during the course of a strike. "The economic strike against the employer is the ultimate weapon in labor's arsenal for achieving agreement upon its terms, and '[t]he power to fine or expel strikebreakers is essential if the union is to be an effective bargaining agent . . . .'" 388 U. S., at 181. The 31 employees involved in this case, joined with their then-fellow members, voted to strike as well as to impose sanctions on those who broke ranks,[4] and participated in the strike. Their votes were voluntary and uncoerced. They had notice of the fines, and raised no objections, perhaps feeling that the hardships that would befall them during the strike would be compensated by ultimate victory at the bargaining table. They

---

[4] The reasonableness of the fines imposed by the Union is not in issue here.

did not attempt to bring the matter to the vote of the membership, a majority of which could have, and later did,[5] terminate the strike.

I am not convinced that in the strike context, where paramount union and employee interests are at stake, union enforcement of this mutual obligation by reasonable fines "invades or frustrates an overriding policy of the labor laws." *Scofield* v. *NLRB,* 394 U. S. 423, 429 (1969).[6] The Court of Appeals concluded that § 7 of the Act, granting employees the right "to *refrain* from any or all" collective activities, including membership and participation in strikes, was not involved in this case. Emphasizing the meaning of the word "refrain," the court concluded that "although § 7 gives an employee the right to refuse to undertake and involve himself in union activities, it does not necessarily give him the right to abandon these activities in midcourse once he has undertaken them voluntarily." 446 F. 2d 369, 373. See H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 39–40 (1947). I believe this notion expressed by the Court of Appeals is applicable in the limited context of the economic strike. In my view, the policy of § 7 would not be frustrated by a holding that an employee could, in the circumstances of this case, knowingly waive his § 7 right to resign from the union and to return to work

---

[5] Counsel for respondent stated in oral argument that the Union membership ultimately voted to terminate the strike and accept the company's offer. Tr. of Oral Arg. 29.

[6] The decision in *Scofield* v. *NLRB,* 394 U. S. 423, 430 (1969), indicated, in dictum, that an employee could avoid a union productivity rule by resigning from membership. That statement should not be construed to mean that employees can never bind themselves to fulfill union obligations where, as here, the enforcement of that obligation is essential to maintain union discipline during a strike. See Recent Cases, 85 Harv. L. Rev. 1669, 1674–1675, n. 23 (1972); Recent Decisions, 40 Geo. Wash. L. Rev. 330, 338–339 (1971).

without sanction.[7]  The mutual reliance of his fellow members who abide by the strike for which they have all voted outweighs, in the circumstances here presented, the admitted interests of the individual who resigns to return to work.  He may still resign, and he may also return to work, but not without the prospect of having to pay a reasonable union fine for which he voted.

The employees who resigned have not asserted any changed circumstances or undue hardships that would justify their resignations and return to work.  Nor do they claim that the fines imposed on them were unreasonable.[8]  Perhaps these matters could be asserted before the Board or in defense in the state court proceedings under prevailing state law.  As these issues have not been argued in this case, they need not be resolved at this time.

I would affirm the decision below.

---

[7] In other contexts it has been held that § 7 rights may be waived. E. g., NLRB v. Shop Rite Foods, Inc., 430 F. 2d 786 (CA5 1970). Indeed, this Court's opinions in Allis-Chalmers and Scofield implicitly recognize that § 7 rights can be waived. NLRB v. Allis-Chalmers Mfg. Co., 388 U. S. 175, 200 (1967) (Black, J., dissenting).

[8] The General Counsel argued before the trial examiner that the fines imposed were unreasonable, and that the imposition of an unreasonable fine would constitute a violation of § 8 (b) (1) (A).  The trial examiner did not pass on this issue, as he concluded that the imposition of any fine on employees who resigned from membership in the Union and returned to work violated § 8 (b) (1) (A).  Neither the Board nor the Court of Appeals passed on this issue, and it has not been argued before this Court.