Victoria HORWATH and Elizabeth Gaudry, Petitioners-Appellants,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent-Appellee,

and

Local Lodge 1129 and District Lodge 8, International Association Of Machinists and Aerospace Workers, Intervening Respondents-Appellees.

No. 75–1805.

United States Court of Appeals, Seventh Circuit.

Argued April 9, 1976.

Decided July 15, 1976.

Rehearing and Rehearing En Banc Denied Oct. 6, 1976.

Jeffrey Lawrence, Chicago, Ill., for petitioners-appellants.

William A. Widmer, III, Chicago, Ill., for intervenor.

Elliott Moore, Deputy Associate Gen. Counsel, Corinna L. Metcalf, John E. Higgins, Jr., Attys., NLRB, Washington, D. C., for respondent-appellee.

Before CUMMINGS and TONE, Circuit Judges, and WYZANSKI, Senior District Judge.*

TONE, Circuit Judge.

The issue before us is the validity of a maintenance-of-membership provision in a collective-bargaining agreement. The provision applies to employees who were union members immediately before the effective date of agreement and employees who thereafter become union members. It does not apply to employees who were not union members immediately before the effective date or future employees. The National Labor Relations Board sustained the union's position that such a provision is lawful when the collective bargaining agreement becomes effective immediately on the expiration of a predecessor agreement containing a similar provision. The Board therefore held that the union had not committed an unfair labor practice under § 8(b)(1)(A) and (2) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(b)(1)(A) and (2), by demanding that the employer discharge employees who, having resigned from the union effective upon the expiration of the old contract, ceased paying dues when the new contract became effective. We sustain the Board.

Since 1964 an uninterrupted series of collective bargaining agreements have been in force between the employer, Sunbeam Corporation's Appliance Division, and the union, Lodge No. 1129 and District No. 8 of the International Association of Machinists and Aerospace Workers. Each agreement has contained a maintenance-of-membership clause providing as follows:

"All employees who are members of the Union on [a given date], and those employees who may thereafter become members shall, during the life of this Agreement remain members of the Union, in good standing."

The 1964 agreement contained an escape clause establishing a period during which union members could resign from the union. The maintenance-of-membership clause of that agreement applied only to employees who were members of the union on the day after the escape period ended. The escape clause was omitted from subsequent contracts, but the maintenance-of-membership clause in the 1970 contract, which immediately preceded the contract in issue here, applied only to employees who were union members one week after the effective date of the contract. The 1970 contract terminated and the 1973 contract now before us became effective at midnight on January 12, 1973. The maintenance-of-membership

---

* The Honorable Charles E. Wyzanski, Jr., Senior District Judge of the District of Massachusetts, is sitting by designation.

clause in the 1973 contract applied to "[a]ll employees who are members of the Union on January 12, 1973."

Petitioners are Sunbeam Appliance Division employees who resigned their union memberships before the expiration of the 1970 contract but continued to pay dues until the contract expired. In accordance with petitioners' view of the facts, we treat the resignations as effective upon the expiration of that contract at midnight on January 12, 1973.[1] Following notification by the union that it would invoke its rights under the maintenance-of-membership clause if petitioners did not pay their dues, they filed unfair labor practice charges before the Board, which were dismissed by the Board's Chicago Regional Director but reinstated by the General Counsel's Office of Appeals. The employer has refused, pending the outcome of this proceeding, the union's request that petitioners' employment be terminated.

■ After a hearing,[2] the Administrative Law Judge ordered that the dispute be submitted to arbitration pursuant to the collective bargaining agreement between the union and the company. On review, the Board ruled out arbitration because neither party to the arbitration would be supporting petitioners' position. Proceeding to the merits, the Board ordered the complaint dismissed, stating:

"The Board has long held that where, as here, there is no time lapse between successive collective-bargaining agreements and there are closely similar union-security clauses, of which maintenance of membership is one form, the union-security clauses have continuity and the new contract, at least as to union security, is to be treated as a continuation of the old contract. *International Union, United Automobile, Aerospace, Agricultural Implement Workers of America (UAW), AFL–CIO (John I. Paulding, Inc.)*, 142 NLRB 296, 301 (1963). This principle was recently affirmed in *The Newspaper Guild of Brockton, AFL–CIO*, [201 N.L.R.B.] 793 (1973). Accordingly, we find that the 1973 contract herein, at least as to the maintenance-of-membership clause, is to be viewed as a continuation of the 1970 contract and that the obligation of the Charging Parties to abide by the clause and pay dues also continued."

### Construction of the Agreement

The *Paulding* doctrine, on which the Board based its interpretation of the contract, has been applied in a series of Board cases, all holding that successive union security clauses are to be construed as merged into a single, continuing requirement of union membership. See, in addition to the cases cited by the Board in the

1. The written resignations are not in the record. According to the stipulation of facts entered into between the General Counsel and the union (to which petitioners now object, see note 2, *infra*) and submitted to the Administrative Law Judge, the resignations were effective "on or before January 13, 1973," the effective date of the new contract. In their brief in this court petitioners take the position that the resignations took effect not on January 13 but "as of the termination of the old contract at midnight, January 12." We resolve the ambiguity in the stipulation in favor of petitioners and accept their position as to when the resignations became effective.

2. Petitioners now complain that they were pressured into proceeding without counsel and accepting a stipulation of facts which was agreed to by the General Counsel and the union. The record, although it is interrupted by several off-the-record discussions, demonstrates that the ALJ proceeded with scrupulous attention to their rights. He fully informed them of their right to be represented by an attorney, and, before any motion for a continuance was made, offered to continue the proceedings so they could obtain counsel. The record shows that at least one petitioner (Horwath) had previously been represented by an attorney in the dispute. When the motion for a continuance was withdrawn, the ALJ again made it clear that the decision was up to them, not him. As for the stipulation, the only specific objection petitioners make here relates to the effective date of their resignations, a point we resolve in their favor. See note 1, *supra*. Petitioners did not specify what other part of the stipulation they found objectionable or what additional evidence they wished to present. They merely disagreed with the General Counsel's statements concerning the extent to which they had been consulted concerning the stipulation. Under these circumstances, we must reject these procedural objections.

above-quoted passage, *Hershey Chocolate Corp.,* 140 NLRB 249, 253–255 (1962); *International Association of Heat Frost Insulators, Local 5,* 191 NLRB 220, 221 (1971), *enforced,* 464 F.2d 1394 (9th Cir. 1972) (mem.). Thus, in *Paulding,* the Board held that even though there was a short gap between the expiration of the old agreement and the commencement of the new (both containing maintenance-of-membership provisions applicable to employees who were union members on their effective date), the new agreement was to be viewed as a continuation of the old, and employees who resigned their union membership effective the last day of the old agreement were subject to the maintenance-of-membership provision.[3]

 We need not pass upon the soundness of the *Paulding* doctrine, for the language of the maintenance-of-membership

provision before us is open to only one reading. The provision applies to all employees who were union members on January 12, 1973, which was the last day of the previous contract. Petitioners were union members on that date, since their resignations became effective at midnight on that date, when the previous contract expired. Accordingly, the provision plainly required that each petitioner maintain his union membership as a condition of continuing in his employment.[4]

### Legality of the Maintenance-of-Membership Clause

Petitioners' argument that the maintenance-of-membership clause is invalid is based primarily upon certain language in *NLRB v. Textile Workers Union,* 409 U.S. 213, 216, 93 S.Ct. 385, 387, 34 L.Ed.2d 422 (1972),[5] in which the Court applied § 7 of

---

**3.** Apparently inconsistent with *Paulding* is the earlier decision in *Marlin Rockwell Corp.,* 114 NLRB 553 (1955), where the Board held that employees who had resigned from the union but had continued to pay dues until the termination of one collective bargaining agreement, were not covered by the maintenance-of-membership clause in a succeeding agreement.

**4.** Normally, of course, we would not affirm an agency action on a ground not relied upon by the agency. *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). This is an exceptional case in which remand to the agency for consideration of alternative grounds would not be appropriate even if we rejected the grounds the agency relied on. The petitioners in their reply brief have asked us to apply ordinary rules of contract construction and could not consistently ask the Board to do otherwise on remand. The Board's application of those rules is not entitled to extraordinary judicial deference, *Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263, 268–269, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960), and if the Board reached any result but the one indicated in the text, we would reverse. In this situation, the following remarks by Justice Fortas are apposite:

"To remand would be an idle and useless formality. *Chenery* does not require that we convert judicial review of agency action into a ping-pong game. In *Chenery,* the Commission had applied the wrong standards to the adjudication of a complex factual situation, and the Court held that it would not undertake to decide whether the Commission's result might have been justified on some other

basis. Here, by contrast, the substance of the Board's command is not seriously contestable. There is not the slightest uncertainty as to the outcome of a proceeding before the Board, whether the Board acted through a rule or an order. It would be meaningless to remand." *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 767, n.6, 89 S.Ct. 1426, 1430, 22 L.Ed.2d 709 (1969) (plurality opinion).

**5.** "Under § 7 of the Act the employees have 'the right to refrain from any or all' concerted activities relating to collective bargaining or mutual aid and protection, as well as the right to join a union and participate in those concerted activities. We have here no problem of construing a union's constitution or bylaws defining or limiting the circumstances under which a member may resign from the union. We have, therefore, only to apply the law which normally is reflected in our free institutions—the right of the individual to join or to resign from associations, as he sees fit 'subject of course to any financial obligations due and owing' the group with which he was associated. *Communications Workers of America v. N. L. R. B.,* 215 F.2d 835, 838, 2 Cir."

See also Chief Justice Burger's concurrence, 409 U.S. at 218, 93 S.Ct. at 388.

"[T]hrough § 7 of the Labor Act, Congress has manifested its concern with those rights in the specific context of our national scheme of collective bargaining. Where the individual employee has freely chosen to exercise his legal right to abandon the privileges of union membership, it is not for us to impose the obligations of continued membership."

the Act (29 U.S.C. § 157). That section guarantees to employees both the right to join labor organizations and the right not to join.

In the *Textile Workers* case the issue was whether it was an unfair labor practice for the union to attempt to fine employees who had resigned from the union during a strike and returned to work while the strike was still going on. Neither the constitution nor the by-laws of the union purported to restrict the right of a member to resign. The Court decided only that under these circumstances § 7 protected the employees' right to resign and that once they had resigned the union had no right to attempt to control them. The case presented no issue concerning a union-security clause or § 8(a)(3).

Section 7 expressly provides that the right to refrain from concerted activity "may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in [§ 8(a)(3)]." Thus it is § 8(a)(3) and not § 7 which determines the validity of a maintenance-of-membership provision.

Section 8(a)(3) provides as follows:

"It shall be an unfair labor practice for an employer—

. . . . .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i)

if such labor organization is the representative of the employees as provided in [§ 9(a)], in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in [§ 9(e)] within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership. . . ."

▆ The first proviso of § 8(a)(3) specifically authorizes "union shop" agreements, under which all employees are required to join, and remain, members of the union as a condition of employment.[6] The word "membership," in the first proviso is qualified, however, by subdivision (B) of the second proviso, as the Supreme Court has recognized:

". . . It is permissible to condition employment upon membership, but membership, insofar as it has significance to employment rights, may in turn be conditioned only upon payment of fees and dues. 'Membership' as a condition of employment is whittled down to its financial core." *NLRB v. General Motors Corp.*, 373 U.S. 734, 742, 83 S.Ct. 1453, 1459, 10 L.Ed.2d 670 (1963).

---

**6.** The first proviso is qualified by § 14(b) of the Act, as amended, 29 U.S.C. § 164(b), which "allows individual States and Territories to exempt themselves from § 8(a)(3) and to enact so-called 'right-to-work' laws prohibiting union or agency shops." See *Oil, Chemical & Atomic Workers Int'l Union v. Mobil Oil Corp.*, —— U.S. ——, 96 S.Ct. 2140, 2142, 48 L.Ed.2d 736 (1976).

Thus § 8(a)(3) merely allows the union to require financial support and not membership in any other sense.[7] Accordingly, the Court held in *General Motors* that the statute permitted an "agency shop" agreement, which only requires employees to pay fees and dues to the union as a condition of employment. Such an agreement, said the Court, "imposes no burden not imposed by a permissible union shop contract and compels the performance of only those duties of membership which are enforceable by discharge under a union shop arrangement." *Id.* at 743, 83 S.Ct. at 1459.

■ Although the holding of the case rested on a reading of the two provisos of § 8(a)(3), the second of which reflects Congress' intent to limit compulsory support of unions to financial support, one passage in the opinion is instructive in connection with the issue before us, which is whether the statute also authorizes another kind of union-security clause less restrictive than a union shop provision. The Court said:

"We find nothing in the legislative history of the Act indicating that Congress intended the amended proviso to § 8(a)(3) to validate only the union shop and simultaneously to abolish, in addition to the closed shop, all other union-security arrangements permissible under state law. There is much to be said for the Board's view that if Congress desired in the Wagner Act to permit a closed or union shop and in the Taft-Hartley Act the union shop, then it also intended to preserve the status of less vigorous, less compulsory contracts which demanded less adherence to the union." 373 U.S. at 741, 83 S.Ct. at 1458.

■ Under an agency-shop provision, which *General Motors* holds is sanctioned by § 8(a)(3), all employees must pay dues, both those who are paying dues on the day a former contract expires and those who are employed thereafter. Under such a contract, no employee ever has a choice whether to support the union financially. Under the contract challenged here, each employee at some time had or will have such a choice. That is the essential difference between the two kinds of provisions. Once the choice in favor of supporting the union is made, the employee's obligation is not different from the obligation imposed by an agency-shop provision.

■ The challenged provision makes a classification which is not invidious. On the one hand, required to support the union by paying fees and dues are those employees who, when they had their opportunity to choose, made that choice in favor of supporting the union. On the other hand, not required to support the union financially are the remaining employees, who, at the time of their opportunity to choose, made or will make the election against supporting the union.

■ Petitioners do not attack the Board's ruling on constitutional grounds. With respect, we do not believe the constitutional argument suggested in the dissent is well founded, even assuming that the Board's failure to prevent the union from enforcing its contractual rights converts the exercise of those contractual rights into federal action. As for the First Amendment argument, the constitutionality of the first proviso of § 8(a)(3), which allows maintenance-of-membership provisions applicable to all employees, is not questioned. Where the only obligation of membership is payment of dues, it is no greater an intrusion on First Amendment rights to restrict an employee's ability to resign from membership than it is to require him to join in the first place. Whether an employee's First Amendment right to freedom of association has been violated by forcing him to support a union cannot depend on whether other employees are similarly coerced. If it is suggested that the distinction between classes of employees is a violation of the

---

7. The union may, however, choose to extend "membership" to any employee who pays fees and dues, even though he "refuses to support or 'join' the union in any other affirmative way." *NLRB v. General Motors Corp.*, 373 U.S. at 744, 83 S.Ct. at 1460. An agency shop agreement "removes that choice from the union and places the option of membership in the employee while still requiring the same monetary support as does the union shop." *Id.*

equal protection guaranteed by the Due Process Clause of the Fifth Amendment, we think the distinction is not invidious and is justified for the reason stated in the preceding paragraph.

The maintenance-of-membership provision before us serves to a limited degree the interest of union security which Congress recognized in the first proviso of § 8(a)(3),[8] while accommodating to some extent the competing interest of employees which Congress has also recognized in that section[9] and in §§ 7 and 14 of the Act. If such less restrictive provisions as the one at bar were impermissible and the union's options were thus limited to the extremes of an all-employee provision on the one hand and no effective maintenance-of-membership provision at all on the other, unions might be driven to insist on all-employee provisions in their collective bargaining agreements, with the result that fewer employees throughout industry would be free to choose whether to pay union fees and dues.

■ We sustain the Board's holding that the Act does not prohibit a maintenance-of-membership provision which imposes no restrictions on new employees and is no more restrictive upon old employees than an all-employee provision expressly sanctioned by the first proviso of § 8(a)(1).[10] The petition for review is denied.

WYZANSKI, Senior District Judge (dissenting).

In the N.L.R. Act, Congress recognized two competing interests: the right of a union to make with an employer a collective bargain which would require employees to contribute dues which would fairly match the services they received, maintain the strength of the union, and promote stability of employment relations and thus industrial peace, and the right of the individual employees to freedom of speech. Hence, there is Congressional sanction for a maintenance of membership clause within the limits specified by Section 8(a)(3) of the N.L.R. Act, 29 U.S.C. § 158(a)(3). *NLRB v. General Motors Corp.*, 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963); *Radio Officers Union v. Labor Board*, 347 U.S. 17, 41, 74 S.Ct. 323, 98 L.Ed. 455 (1954); *NLRB v. Hershey Foods Corp.*, 513 F.2d 1083, 1085–1086 (C.A. 9, 1975).

But the instant case is not in the familiar pattern. The collective bargain here at issue does not require maintenance of membership of *all* employees in the designated unit, nor is it confined to those employees who when the bargain was made wanted to be members of the union. It goes beyond those who then wanted membership, and seeks to embrace those who vainly had sought to withdraw from an earlier commitment; yet it does not simultaneously embrace those who had never been volun-

---

**8.** See *Oil, Chemical & Atomic Workers Int'l Union v. Mobil Oil Corp.*, *supra*, n.6 —— U.S. at ——, 96 S.Ct. at 2145:

> "Congress' decision to allow union security agreements at all reflects its concern that, at least as a matter of federal law, the parties to a collective-bargaining agreement be allowed to provide that there be no employees who are getting the benefits of union representation without paying for them."

**9.** See Justice Stewart, dissenting in the *Oil, Chemical & Atomic Workers* case, *supra*, n.6 —— U.S. at ——, 96 S.Ct. at 2150:
> "Section 8(a)(3) was designed to curb the abuses of compulsory unionism, which 'create[d] too great a barrier to free employment,' S.Rep. No. 105, 80th Cong., 1st Sess., 6 (1947), but at the same time, to continue to

afford unions a measure of security by enabling them to prevent 'free riders.' *Id.*, at 6."

**10.** Although the present issue was not before the Court in the recent *Oil, Chemical & Atomic Workers* case, *supra*, n. 6, it is not irrelevant that the first proviso was there described by Justice Marshall, speaking for the Court, as referring to "lesser union security agreements" than closed shops, —— U.S. at ——, 96 S.Ct. at 2145, n.9, and "union security agreements less onerous than the closed-shop agreement," *id.*, at ——, 96 S.Ct. at 2145, and by Justice Stewart in dissent as sanctioning "any lesser security arrangement . . . only if it harmonizes with state policy," *id.* at ——, 96 S.Ct. at 2150. (The "only if" clause refers to § 14(b). See note 6, *supra*.) These descriptions are perhaps some indication of the Court's reading of the proviso, although they are of course not compelling.

tary members. The inclusion merely of those who had indicated a desire to withdraw has obviously a peculiar characteristic: it is selectively coercive. Its purpose is not primarily to stabilize, but to hold in thrall. Such eclecticism has an object ulterior to the two rights which Congress recognized. And that object is an interference with the freedom of association impliedly protected by the First Amendment to the Constitution—an interference for which there is not an adequate ground plausibly to contend that the purpose of the First Amendment is counter-balanced.

The flaw in the majority opinion, in my judgment, is that it rests on what is a sound mathematical, but not always a sound legal, principle: that the whole necessarily includes the parts. Selectivity of a part may have, and indeed here has, an invidious connotation which would be absent had the whole been embraced.