472 F.2d 416
 82 L.R.R.M. (BNA) 2066, 70 Lab.Cas. P 13,258
 MORTON SALT COMPANY, a division of Morton International,
Inc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and
International Association of Machinists, Oakland Lodge No.
284, International Association of Machinists and
Aerospace Workers, AFL-CIO, Intervenor.
 No. 71-1853.
 United States Court of Appeals,
Ninth Circuit.
 Dec. 8, 1972.
 
 Robert M. Lieber (argued), of Littler, Mendelson & Fastiff, San Francisco, Cal., for petitioner.
 Joseph E. Mayer, Atty. (argued), Marcel Mallet-Prevost, Asst. Gen. Counsel, Peter G. Nash, Gen. Counsel, Washington, D. C., Roy O. Hoffman, Director, Region 21, NLRB, San Francisco, Cal., for respondent.
 
 
 1
 Bernard Dunau (argued), Plato E. Papps, Washington, D. C., for intervenor.
 
 
 2
 Before CHAMBERS and BROWNING, Circuit Judges, and SHARP,* District Judge.
 
 SHARP, District Judge:
 
 3
 This case involves the assessment of fines by a union against certain of its members for refusing to honor a sister union's picket line. The principal issues it presents are:
 
 
 4
 (1) Was the imposition of any discipline whatsoever an unfair labor practice violation of a no-strike provision in the applicable labor contract; and, if not,
 
 
 5
 (2) Is the validity of the fines affected by the reasonableness of the amounts?
 
 
 6
 Employees of petitioner (hereinafter called "Company") are represented by two different unions. One union is composed of the warehouse production employees represented by Warehousemen's Local 853, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter called "Teamsters"). The other is a unit of machinists represented by intervenor union (hereinafter called "Machinists"). Separate collective bargaining agreements were negotiated by each of the unions for their respective bargaining units. The Machinists with whom we are involved were working under an agreement which contained the following "no-strike-no-lockout" clause:
 
 
 7
 "No-Strike-No-Lockout: During the life of this Agreement, the Union will not cause a strike or production stoppage of any kind, nor will any employee or employees take part in a strike, intentionally slow down the rate of production or in any manner cause interference with or stoppage of the Employer's work, provided the Employer follows the grievance procedure for which provision is made herein. Likewise, the Employer agrees that there shall be no lockouts during the life of this Agreement provided the Union follows the grievance procedure for which provision is made herein. It shall not be considered a violation of this Agreement if the employees of the Employer fail to report for work by reason of a legitimate, authorized picket line established by another union which has a collective bargaining agreement with the Employer, and sanctioned by the Bay Cities Metal Trades Council or the Central Labor Council having jurisdiction."
 
 
 8
 The contract between the Company and the Teamsters expired and the Teamster employees went out on strike to obtain a new contract. Members of the Machinists were told by their shop steward that they were to honor the Teamsters' picket line. One machinist crossed the picket line and reported for work. He was told by the business representative that his union observed legally sanctioned picket lines; nevertheless, he continued to work for approximately six weeks more, after which he took other employment. For this he was fined and banned from holding a union office for five (5) years. The fine and ban on holding office were ratified by the union membership, and he took no appeal. After the strike continued for approximately nine weeks, six other machinists threatened to return to work if the strike was not soon settled. They were advised by their business agent that if they did, they would be fined. Nevertheless, two weeks later they crossed the line and returned to work. Charges were filed against all six employees for "conduct unbecoming a member." They were tried by the union's trial committee, found guilty and fined $1,000 each and expelled from union membership. The full membership of the union, at their next regular meeting, ratified the penalties.
 
 
 9
 The company filed unfair labor charges with the NLRB against the union, alleging violation of Section 8 (b)(1)(A) of the National Labor Relations Act. The case was heard by the Board upon stipulated facts and the Board dismissed the complaint, concluding that the no-strike provision did not protect those employees crossing the Teamsters' picket line from union discipline, and the fines imposed by the union against these employees did not violate Section 8(b)(1)(A) of the National Labor Relations Act. The Board declined to consider the reasonableness of the amounts of the fines. The Company petitioned for review.
 
 
 10
 A threshold question raised by intervenor union is whether the Board was barred from adjudicating any issue other than the issue relating to the excessiveness of the fine. The complaint filed by the General Counsel of the Board asserts the Company's charge that the union committed an unfair labor practice in imposing fines on those members crossing the picket line. During the course of the proceeding the Company moved, pursuant to Section 10(b) of the National Labor Relations Act and Rule 15(b) of the Federal Rules of Civil Procedure to amend the complaint to conform to the evidence; namely, that the union violated Section 8(b)(1)(A) by imposing any penalty whatsoever. The Board denied the motion, ruling in effect that the complaint before it, together with the record, properly raised the issue of whether the assessment of fines was actually an unlawful imposition of penalties for refusing to participate in a work stoppage which violated the no-strike clause. Thus, the Board found it unnecessary to amend the complaint. Intervenor charges that the Board's adjudication of this issue was wholly beyond its power in view of the specific provisions of Section 3(d) of the National Labor Relations Act, which provides in part as follows:
 
 
 11
 "(d) There shall be a General Counsel of the Board who . . . shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board, and shall have such other duties as the Board may prescribe or as may be provided by law."
 
 
 12
 In support of its argument, intervenor relies on Frito Co. v. NLRB, 330 F.2d 458 (9th Cir. 1964), and NLRB v. Raytheon, 445 F.2d 272 (9th Cir. 1971). While these cases deny the Board's jurisdiction to permit amendments to the General Counsel's complaints, Frito makes it clear that defining the issues presented by a complaint is an adjudicatory function of the Board:
 
 
 13
 "It is now well settled that the General Counsel's decision to investigate a charge or issue a complaint is unreviewable by the Board. However, once the decision has been made to issue a complaint and to prosecute it, the General Counsel has embarked upon the judicial process which is reserved to the Board. If the General Counsel can control this process, then the General Counsel can indeed usurp the Board's responsibility for establishing policy under the Act by simply withholding from the Board any issue which might precipitate a meaningful policy decision not in accord with the view of the General Counsel.
 
 
 14
 In passing, it should be observed that defining the issues which are posed by the opposing pleadings has always been regarded as a judicial function." Frito, supra, at 463-464.
 
 
 15
 Our review of the complaint, together with the stipulated facts, convinces us that no amendment of the complaint was necessary and that the issues considered by the Board were properly before it.
 
 
 16
 Analysis of the principal issues presented requires a balancing of the rights protected by Section 7 and Section 8(b)(1)(A) of the Act, together with an interpretation of the abovequoted no-strike provision of the contract:
 
 
 17
 Section 7: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title." 29 U.S.C. Sec. 157.
 
 Section 8
 
 18
 (b)(1)(A): "(b) It shall be an unfair labor practice for a labor organization or its agents-
 
 
 19
 (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; . . ." 29 U.S.C. Sec. 158(b)(1).
 
 
 20
 The Company, while conceding that the no-strike provision gave individual employees the right to honor the Teamsters' picket line, argues that the union, in inducing its membership as a whole to honor the picket line and fining individuals who returned to work, coerced and compelled its members to stop work in violation of the union's no-strike pledge. This coercion, it is urged, frustrates a fundamental goal of our national labor policy-the peaceful resolution of disputes without resort to work stoppages. We agree, of course, that industrial harmony is fostered by no-strike-no-lockout clauses and that such pledges are in the public interest. However, fundamental to this is that the industrial dispute covered by any such clause be subject to a grievance or arbitration procedure.
 
 
 21
 "As we have previously indicated, a no-strike obligation, express or implied, is the quid pro quo for an undertaking by the employer to submit grievance disputes to the process of arbitration." Boys Markets, Inc. v. Retail Clerk's Union, 398 U.S. 235, 247-248, 90 S.Ct. 1583, 1591, 26 L.Ed.2d 199 (1970); Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957).
 
 
 22
 While a no-strike provision directed to the union amounts to a waiver of a right of that union to regulate certain activities of its members in accordance with union rules, such waiver must be clear and unmistakable and will not be extended by implication to bar regulation of activities not clearly contemplated in the language used. Timken Roller Bearing v. NLRB, 325 F.2d 746, 750-751 (6th Cir. 1963); Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 76 S.Ct. 349, 355-356, 100 L.Ed. 309 (1956).
 
 
 23
 ". . . statutorily protected rights to strike and to observe picket lines are not to be regarded as waived in the absence of a visible purpose to do so." News Union v. NLRB, 393 F.2d 673, 677 (D.C. Cir., 1968).
 
 
 24
 In conformity with these principles, the Board concluded that the no-strike provision is tied to the grievance provisions contained elsewhere in the contract and is not related to the right of the union to require its members to honor a sister union's lawful strike by not crossing its picket lines. The Board contrasts the instant no-strike provision with the clause interpreted in National Grinding Wheel, 176 NLRB No. 89, 71 LRRM 1311 (1969). There, the clause simply stated:
 
 
 25
 "During the term of this agreement, the company will not conduct a lockout at its plant, and the union or the local union will not cause and permit its members to cause any strike or slowdown, total or partial, of work to the company's plant."
 
 
 26
 Arguing that the no-strike clause only prohibited strikes in the furtherance of the bargaining units' own demands (as contrasted with honoring a picket line of a sister union's striking members), the union imposed penalties on those of its members who declined to honor a lawful economic strike of a sister union. In finding an 8(b)(1) (A) violation, the Board stated:
 
 
 27
 "3. The language of the no-strike clause makes no such distinction. The clause forbids Respondent to 'cause or permit its members to cause any strike or slow-down, total or partial, of work at the Company's plant.' The bulk of Respondent's members that stayed off the job were engaging in a work stoppage, which, pro tanto, was a partial strike. Whether they did so in furtherance of their own demands or of a cause of the sister-local, their work stoppage suspended the continuity of their operations in either instance. This stoppage of work on their part was in the face of the language forbidding Respondent to 'cause' it or even 'permit' it." Id. at 1312.
 
 
 28
 Here, the no-strike clause expressly reserves the individual employees' right to honor other unions' lawful picket lines. While this reservation is not determinative of the issue herein discussed, it does indicate that the clause in question is less restrictive than that in National Grinding Wheel. Additionally, the proviso language specifically conditions the effectiveness of the no-strike pledge on the employer's acceptance of the grievance procedure included elsewhere therein. As stated by the Board below:
 
 
 29
 "Moreover, apart from the specific immunity granted employees under the terms of the contract, we think that Respondent's no-strike commitment was not intended to apply to the instant case. Thus, the no-strike obligation is limited in terms to cases where 'the Employer follows the grievance procedure.' The import of that phrase is that the no-strike clause is tied only to disputes that can arise under the contract and thus are amenable to the grievance procedure of the contract. Obviously, a dispute of that nature must relate to some breach of a term and condition of employment. The conduct sought to be induced, however, was not in support of a dispute arising under the employee's own terms and conditions of employment and thus would not be subject to the grievance machinery provided by Respondent's contract." 190 NLRB No. 32, at page 9.
 
 
 30
 This appears to be a reasonable interpretation of the clause, which we will not disturb on this appeal. Our determination in this regard is also dispositive of petitioner's related challenge of the Board's order; namely, that the coercive effect of the fines levied against its members was an 8(b) (1) (A) violation of this Section 7 right to refrain from engaging in unlawful concerted action sought by the union. In urging this position, petitioner recognized that NLRB v. Allis-Chalmers and Scofield v. NLRB have "struck the balance" between the right of a union to administer its internal affairs as opposed to the right of its individual members to refrain from concerted action sought by the union."Section 8(b) (1) makes it an unfair labor practice to 'restrain or coerce (A) employees in the exercise of the rights guaranteed in [Sec. 7]: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein * * *.'
 
 
 31
 Based on the legislative history of the section, including its proviso, the Court in NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 195, 87 S.Ct. 2001, 2014, 18 L.Ed.2d 1123 (1967), distinguished between internal and external enforcement of union rules and held that 'Congress did not propose any limitations with respect to the internal affairs of unions, aside from barring enforcement of a union's internal regulations to affect a member's employment status.' A union rule, duly adopted and not the arbitrary fiat of a union officer, forbidding the crossing of a picket line during a strike was therefore enforceable against voluntary union members by expulsion or a reasonable fine." Scofield v. NLRB, 394 U.S. 423, 428, 89 S.Ct. 1154, 1157, 22 L.Ed.2d 385 (1969).
 
 
 32
 Having determined above that the "no-strike" provision has no application to the honoring of a lawful picket line of a sister union, the imposition of reasonable fines becomes simply a matter of internal affairs management.
 
 
 33
 The other issue presented is more troublesome. Apparently, the Board has consistently taken the position, as it has in this case, that it will not examine the amount of otherwise legally imposed fines to determine their reasonableness. Stated another way, the board's position has been and is in this case that the reasonableness of fines imposed will not be examined by the Board, but, instead, is subject to the exclusive jurisdiction of any state court called upon by the union to assist in collecting the fine from the disciplined employee. This issue is one of first impression in this circuit and has never been directly before the United States Supreme Court.
 
 
 34
 Both parties refer us to Allis-Chalmers and Scofield in support of their respective positions. In Allis-Chalmers the Supreme Court was faced with the question
 
 
 35
 ". . . whether a union which threatened and imposed fines, and brought suit for their collection, against members who crossed the union's picket line and went to work during an authorized strike against their employer, committed the unfair labor practice under Sec. 8(b) (1) (A) of the National Labor Relations Act of engaging in conduct 'to restrain or coerce' employees in the exercise of their right guaranteed by Sec. 7 to 'refrain from' concerted activities." NLRB v. Allis-Chalmers Manufacturing Company, 388 U.S. 175, 176, 87 S.Ct. 2001, 2004 (1967).
 
 
 36
 After a detailed review of the legislative history of the provision, the Supreme Court concluded that it was not an unfair labor practice for a union to impose reasonable fines upon those of its members who work during an authorized strike. However, the precise issue we face here, that is whether the Board or an enforcing court should determine reasonableness, was not before the Supreme Court.
 
 
 37
 In Scofield, the Supreme Court dealt with the legality of union fines imposed upon members disregarding a piecework ceiling rule set by their union. Again, the court examined the interplay between Sections 7 and 8(b)(1)(A), reaffirming its decision in Allis-Chalmers, with the conclusion that
 
 
 38
 "A union rule, duly adopted and not the arbitrary fiat of a union officer, forbidding the crossing of a picket line during a strike was therefore enforceable against voluntary union members by expulsion or a reasonable fine." Scofield, supra, 394 U.S. at 428, 89 S.Ct. at 1157.
 
 
 39
 While, again, the issue was not squarely presented to the Supreme Court, we particularly note the adjective "reasonable" in the above-quoted portion of the opinion used in the context of enforceability and legality of the fine. The corollary of this Scofield conclusion is that an unreasonable fine is an unfair labor practice. A statutory responsibility of the Board is to adjudicate and remedy unfair labor practices. NLRA Sec. 10(a); 29 U.S.C. Sec. 160(a). We conclude that the determination of reasonableness is for the Board.
 
 
 40
 A similar conclusion was reached by the Court of Appeals for the District of Columbia Circuit [Booster Lodge No. 405, Int. Ass'n of Machinists and Aerospace Workers v. NLRB, 459 F.2d 1143, (D.C. Cir. 1972)], which involved a consideration of the "legal implications of the 'reasonableness' of the fines imposed, where the union has threatened enforcement thereof, or has actually sought collection through legal means." The Court concluded that,
 
 
 41
 "Since the imposition of an unreasonably excessive disciplinary fine is violative of Section 8(b)(1)(A), it is clearly the obligation of the N.L.R.B. to resolve the question of reasonableness where such an issue is appropriately raised." Booster Lodge, supra, 459 F.2d at 1157.
 
 
 42
 In addition to interpreting Allis-Chalmers and Scofield as supportive of its position, the District of Columbia court recognized that access to the Labor Board by the disciplined employee is more readily available than meaningful access to state courts. Furthermore, the court noted the desirability of having reasonableness of fines determined by standards that are as nearly uniform as national standards promulgated by the Board can be. We agree that the lawfulness of fines imposed depends, in part, upon the reasonableness of the amount, and that the NLRB is the proper forum for this determination.
 
 
 43
 Accordingly, we remand to the Board for further proceedings consistent herewith.
 
 
 44
 BROWNING, Circuit Judge (concurring in part, dissenting in part):
 
 
 45
 The majority's holding that the Board accurately defined the issues before it seems proper.
 
 
 46
 The majority's further holding that the Board correctly interpreted the "no strike" clause also appears sound. It follows, as the majority concludes, that the Board correctly held that the Union's act of fining its members for refusing to honor the picket line was not in itself an unfair labor practice. This is settled by NLRB v. Allis-Chalmers Mfg. Co., 388 U.S 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967).
 
 
 47
 The majority then concludes, however, that if the fines were "unreasonable" in amount their imposition was an unfair labor practice, and hence subject to the Board's jurisdiction under the National Labor Relations Act. The Board held, to the contrary, that a union disciplinary fine does not become an unfair labor practice subject to the Board's jurisdiction because it is excessive in amount, and that the reasonableness of such a fine is to be determined by state courts in the exercise of their traditional jurisdiction over suits involving relationships between voluntary associations and their members.
 
 
 48
 Giving the Board's interpretation of the statute the deference to which it is entitled,[1] it should be sustained.
 
 
 49
 The Board is not granted general power to resolve any and all disciplinary disputes between unions and their members. On the contrary, "[u]nless the [union] rule or its enforcement impinges on some policy of the federal labor law, the regulation of the relationship between union and employee is a contractual matter governed by local law." Scofield v. NLRB, 394 U.S. 423, 426 n. 3, 89 S.Ct. 1154, 1156 (1969). Specifically, "the state courts, in reviewing the imposition of union discipline, find ways to strike down 'discipline, [which] involves a severe hardship."' NLRB v. Allis-Chalmers Mfg. Co., supra, 388 U.S. at 193, n. 32, 87 S.Ct. at 2013.
 
 
 50
 It is the responsibility of the Board, as the majority states, "to adjudicate and remedy unfair labor practices," as defined by the National Labor Relations Act. But the majority does not indicate why an "unreasonable" fine for violating a union anti-strikebreaking rule is an unfair labor practice under the Act, when a "reasonable" fine for violating such a rule is not. The majority simply asserts that this result follows from the Supreme Court's use of the adjective "reasonable" in relation to fines held not to constitute unfair labor practices.
 
 
 51
 There are other reasons for the Supreme Court's references to "reasonable" fines. The most obvious is that there was no contention that the fines in Scofield were unreasonable. See 394 U.S. at 430, 89 S.Ct. 1154, 22 L.Ed.2d 385. The same is true of the fines involved in Allis-Chalmers. See 388 U.S. at 192-193 n. 30, 87 S.Ct. 2001, 18 L.Ed.2d 1123. If the adjective was used with some purpose in addition to that of accurately stating the facts of the cases, it "seems directed to enforcing courts, encouraging those courts to make an independent determination of the reasonableness of the fine in each case presented, in the same fashion as courts limit other union discipline which imposes a severe hardship." International Association of Machinists and Aerospace Workers v. O'Reilly, 185 NLRB No. 22 at 7.
 
 
 52
 The Board has power to examine the reasonableness of a fine for violation of a union's anti-strikebreaking rule only if imposition of an excessive fine for this purpose is expressly or impliedly prohibited by some provision of the Act. Such a prohibition is said to be implicit in section 7 and section 8(b)(1)(A).
 
 
 53
 It is argued that the section 8(b)(1)(A) prohibition against union coercion and restraint upon the exercise of an employee's section 7 right to refrain from concerted activities was qualified in Allis-Chalmers only to the extent necessary to permit the union to protect its status as a bargaining representative for the unit as a whole. If a union seeks to impose a fine larger than is required for this purpose, the argument continues, "an inference is warranted that the fine was imposed on the member, not in vindication of a legitimate union interest, but as a reprisal for having exercised a statutorily protected right." International Association of Machinists and Aerospace Workers v. O'Reilly, supra, 185 NLRB No. 22 at 14 (Member McCulloch, dissenting). The same notion, stated in the same language, is found in Booster Lodge No. 405 v. NLRB, 459 F.2d 1143, 1159 (D.C.Cir. 1972). Petitioner adopts it also, phrased in terms of permissible "deterrence" versus prohibited "retribution."
 
 
 54
 The argument rests upon the premise that a union member has a "statutorily protected right" to cross a picket line in violation of a union rule. But the precise holding of Allis-Chalmers is that sections 7 and 8(b)(1)(A) grant no such right.
 
 
 55
 Petitioner disputes this interpretation, arguing that under Allis-Chalmers a union may not impose a fine large enough to completely remove an employee's economic incentive to violate an anti-strike-breaking rule. Under Allis-Chalmers, petitioner asserts, a union may impose some punishment upon its members for violating a union rule against crossing a picket line, but not so much as to assure their compliance with the union rule.[2] Allis-Chalmers does not permit such a distinction. The necessary effect of a fine in any amount is, literally, "to restrain or coerce" a member to adhere to the union's anti-strikebreaking rule. Nevertheless, the Allis-Chalmers court held that as used in section 8(b)(1)(A) these words simply were not intended to include a prohibition against the imposition of fines on union members who violate such a rule. "Congress did not propose any limitations with respect to the internal affairs of unions, aside from barring enforcement of a union's internal regulations to affect a member's employment status." NLRB v. Allis-Chalmers Mfg. Co., supra, 388 U.S. at 195, 87 S.Ct. at 2014.
 
 
 56
 Taking a cue from the concluding phrase of this quotation, petitioner argues that an unreasonably large fine for crossing a picket line does indeed "affect a member's employment status." This argument finds support in Booster Lodge No. 405 v. NLRB, supra, 459 F.2d at 1159. Of course, the union could not induce the employer to threaten the member with suspension or discharge as a means of collecting a fine, but this is true whether the fine is reasonable or unreasonable in amount. Absent some such conduct, the mere imposition of an unreasonably large fine would have no effect upon the member's employment status. The fine would be collectible, or would not, whether the employee retained his employment or left it.[3]
 
 
 57
 A fine may be unreasonably high, but not because of its impact upon a union member's right to cross a picket line in violation of a union rule, or on the supposition that it affects his employment status. In a collection proceeding, a statute court may find equitable reasons for refusing to enforce unnecessarily severe punishment (NLRB v. Allis-Chalmers Mfg. Co., supra, 388 U.S. at 193 n. 32, 87 S.Ct. 2001), but collection proceedings are not for the Board.[4]
 
 
 58
 In some circumstances, it has been suggested, the unfair use of fines may violate the union's duty of fair representation (see Note, Fair Representation and Union Discipline, 79 Yale L.J. 730, 742 (1970); Note, Labor Policy: Judicial Enforcement of Fines after Allis-Chalmers, 53 Cornell L.Rev. 1094, 1097 (1968)), but there is no contention that such circumstances exist in this case.
 
 
 59
 Since under Allis-Chalmers a fine which restrains a union member from working during a strike is not an unfair labor practice, and since no other tenable theory of an unfair labor practice has been advanced in this case, the Board correctly ruled that it had no jurisdiction to consider the reasonableness of the fines.
 
 
 
 *
 The Honorable Morell E. Sharp, United States District Judge for the Western District of Washington, sitting by designation
 
 
 [1]
 See NLRB v. Denver Building & Construction Trades Council, 341 U.S. 675, 691-692, 71 S.Ct. 943, 95 L.Ed. 1284 (1951)
 
 
 [2]
 In O'Reilly v. NLRB, a case raising this same issue and decided by the court this day, petitioner frames this argument as follows:
 "Enforcement of the Union's rule against working during a strike by the imposition of a fine equal in amount to employee's take-home pay serves in the instant case to deny completely that employee's right to refrain from collective activity guaranteed in Section 7 of the Act. As suggested, above, the Union may have legitimate interest in protecting its own position, especially during a strike. It may take disciplinary action to deter recalcitrant and other members from undermining its status by the assessment of reasonable fines for strike breaking. In doing so, the Union furthers its own interest, and that of its membership, by action which necessarily infringes, but not to a prohibitive extent, the Section 7 rights of the members affected. . . .
 "Although, as the Court suggests in Allis-Chalmers, the Union may be likened to a legislative body in that its action may tend to 'restrict the rights of those whom it represents,' nowhere does the Supreme Court begin to suggest that the Union in the legitimate exercise of its internal or external powers may deny its members' Section 7 rights in their entirety. Yet the Union's action in the instant case has precisely this effect. By assessing fines in the amount of take-home pay earned during a strike, the Union completely negates the positive value of a member's exercise of his right not to participate in a work stoppage. Additionally, the Union makes clear to all other members that any future attempt at exercising this right not to strike will be completely frustrated by subsequent union action denying to those employees any remuneration they earn during the period of a strike. To permit such union action would render the Section 7 right permitting employees to refrain from collective activities utterly superfluous, and would deny any purpose of Congress in including these words in the Section. Whether by a holding that such a fine was not restraint or coercion within the meaning of Section 8(b)(1)(A), or that it was protected by the proviso to that Section, the sanctioning of such a fine would work directly against the clear intent of Congress in amending Sections 7 and 8." Brief for Petitioner at 33-35, O'Reilly v. NLRB, 472 F.2d 426 (9th Cir. 1972).
 
 
 [3]
 Other arguments favoring Board jurisdiction are based on the preemption doctrine (Brief for Petitioner at 41-47, Morton Salt v. NLRB, No. 71-1853 (9th Cir. 1972)) and upon the advantage of uniform review of fines by a body economically accessible to the employee. See Booster Lodge No. 405 v. NLRB, supra, 459 F.2d at 1158. The preemption argument is undercut by the Supreme Court's explicit acknowledgement of state court jurisdiction in Allis-Chalmers, 388 U.S. at 193 n. 32, 87 S.Ct. 2001. Uniformity and economic accessibility may be valid policy reasons for a legislative grant of jurisdiction to the Board, but they cannot furnish a basis for jurisdiction in the absence of such a grant
 
 
 [4]
 As counsel for the Board points out, when Congress undertook to regulate the internal disciplinary processes of unions by the passage of the Labor-Management Reporting and Disclosure Act of 1959, Pub.L.No. 86-257, Sept. 14, 1959, 73 Stat. 519, it vested the authority in the Department of Labor and the United States Courts, and not in the Board. State court remedies were expressly saved. See L.M.R.D.A. Secs. 103 and 603(a); 29 U.S.C. Secs. 413, 523(a)